## GIDDENS v. THE STATE.

1. Under art. 1, sec. 1, par. 2, of the constitution of the State of Georgia (Civil Code of 1910, § 6358), protection to person and property is the paramount duty of government, and shall be impartial and complete.

2. Under art. 1, sec. 1, par. 16, of the constitution of the State of Georgia (Civil Code of 1910, § 6372), the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.

3. "To slay an officer who is without authority of law to make an arrest for a misdemeanor, where the motive of the slayer is merely to avoid an illegal arrest, would be manslaughter." Under the evidence in the case the defendant is guilty of manslaughter, if guilty of anything.

4. Under the evidence in this case, the verdict of the jury finding the defendant guilty of murder is contrary to law and contrary to the evidence; and the court erred in refusing a new trial.

No. 3156. AUGUST 17, 1922.

Indictment for murder.    Before Judge Eve.    Worth superior court.    March 4, 1922.

*James H. Tipton,* for plaintiff in error.

*George M. Napier, attorney-general, R. S. Foy, solicitor-general,* and *Seward M. Smith, asst. atty.-gen.,* contra.

HILL, J.  Macie Giddens was indicted for the offense of murder. The jury trying the defendant found him guilty of murder, without recommendation; and he was sentenced to be hanged.  The defendant made a motion for new trial, on the usual general grounds that the verdict was contrary to the evidence, etc.; and the amended grounds complained of an excerpt from the charge of the court and also elaborated the general ground that the verdict was contrary to law and the evidence.

In the view we take of this case the court below erred in overruling the motion for a new trial.  We are of the opinion that the defendant was entitled to a new trial upon the general ground that the verdict finding him guilty of murder was contrary to the evidence.  The evidence in the case shows that the deceased, who was a constable in the district in which he lived, and where he was on the night of the homicide, together with four other men, went to the home of the defendant, who was temporarily residing with his mother, about eight o'clock at night, after the defendant and other members of the household had retired and gone to bed.  The evidence shows that before going to the home of the defendant the deceased called up the sheriff of the county by telephone, the sheriff living in another part of the county, and inquired of him if he had warrants for the defendant.  The sheriff replied that he had two warrants for misdemeanor charges; and on being asked by the constable if he wanted the defendant arrested, the sheriff replied that he did.  But the sheriff did not turn over these warrants to the constable, and the latter proceeded to the home of the defendant ostensibly for the purpose of arresting him, in company with the four other men, as above stated.  One member of this posse, by the name of Alred, was a man with whom the defendant had lived and whose farm the defendant had left; and in his statement the defendant said that when this posse surrounded his house, a part of them going on one side and a part on the other side of the house, he saw the shoulders and outline of the form of Mr. Alred through the window, and the latter having threatened to kill him

on one or more occasions, he thought that the men had come to do personal violence to him. There is a conflict in the evidence as to whether, when the deceased knocked on the door and asked to be admitted, the deceased stated who he was and what his purpose was. One of the witnesses for the State testified that when the deceased knocked on the door of the home of the defendant he asked if Macie Giddens was inside, and that some woman's voice from the inside replied that he was not; that the deceased then said he was Pickett Giddens, the constable, and that he had some papers for Macie Giddens, and that he did not mean to do him any harm. On the other hand, there was evidence to show that W. P. Giddens, the constable, was a man who talked in a low voice, that he had a peculiar voice, and that it was somewhat difficult to hear him distinctly; and one of these witnesses, Hazel Mae Sellars, who was a niece of the defendant residing in the house, but who was put up as a witness by the State, testified that she did not hear Mr. Giddens say that he was a constable and that he had papers for the arrest of the defendant. The defendant also in his statement said that he heard no such announcement. In point of fact the evidence is undisputed that the constable did not have a warrant for the arrest of Macie Giddens, and had no other papers authorizing his arrest. When the inmates of the house failed to open the door, the constable either kicked or pushed the door partly open, and when it was in a half-open condition the fatal shot was fired from the inside from a shotgun the shell from which had been cut around so as to make the entire shot enter the body of the deceased. The defendant denied having fired the shot. There is some evidence on the part of the State to the effect that after the defendant was arrested he admitted that he fired the shot after the door was broken open. This the defendant denied.

In view of this evidence and other circumstances of the case, we are of the opinion that the jury were not authorized to find the defendant guilty of murder. While a person is not justified in killing in defense against an illegal arrest of an ordinary character, the law sets such a high value upon the liberty of the citizen that an attempt to arrest made unlawfully is esteemed a great provocation, such as may reduce the killing in resisting such arrest to manslaughter. The general rule is that it is not murder but manslaughter to kill an officer to prevent an illegal arrest, unless the

evidence shows previous or express malice; and in such case it is immaterial whether the slayer knew of the unlawful character of the proposed arrest or not. Wharton on Homicide (3d ed.), 629, § 407.

In *Davis* v. *State*, 79 *Ga.* 767 (4 S. E. 318), it is stated and held: "A warrant was issued by a magistrate on the affidavit of the constable, and was placed in the hands of the latter to execute. He claimed to have deputized a third person to execute it. This third person went to the house of the defendant, and without informing him that he had a warrant for his arrest, or that he had been deputized by the constable, undertook to arrest the defendant; the latter resisted, broke loose, and ran around the house, followed by the other person, and finally ran into the back door of his house; and upon the other person's attempting to enter with a pistol in his hand, the defendant shot him with a single-barrel shotgun loaded with squirrel-shot. *Held,* that in the absence of notice to the defendant that the person pursuing him was an officer or had a warrant for his arrest, a verdict finding him guilty of assault with intent to murder was contrary to law and the evidence, and a new trial should have been granted on motion." It was further held in that case that "It was improper for the magistrate to place the warrant in the hands of the prosecutor to execute, although the latter was a constable of the district; and it is doubtful whether the constable had the right to deputize or summon another person to assist him in the execution of the warrant." In delivering the opinion of the court Simmons, J., quotes with approval from 1 Wharton's Criminal Law, § 648, as follows: "The officer must at the time be engaged in executing his duties, and the defendant must be notified thereof, and unless there be notification or knowledge to this effect, the killing of the officer in resistance of the arrest will not be murder. Thus, where a bailiff pushed abruptly and violently into a gentleman's chamber early in the morning, in order to arrest him, but not telling his business or using words of arrest; and the party, not knowing that the other was an officer, in the first surprise snatched down a sword which hung in the room and killed the bailiff, this was ruled to be only manslaughter."

Penal Code §§ 70, 71, and 72 are as follows: (70) "There being no rational distinction between excusable and justifiable homicide,

it shall no longer exist. Justifiable homicide is the killing of a human being by commandment of the law in execution of public justice; by permission of the law in advancement of public justice; in self-defense, or in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either; or against any persons who manifestly intend and endeavor, in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein." (71) "A bare fear of any of those offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge." (72) "If, after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another can not be prevented, it shall be justifiable homicide to kill the person so forcibly attacking and invading the property or habitation of another; but it must appear that such killing was absolutely necessary to prevent such attack and invasion, and that a serious injury was intended, or might accrue to the person, property, or family of the person killing."

In *Pound* v. *State*, 43 *Ga.* 88, 136, Chief Justice Lochrane, in construing what are now the above sections of the code, said: " Our opinion is, construing all the sections together (and such is the proper mode of arriving at the correct conclusion), that § 4266 [72] applies only to the defense given to the citizen in protecting his habitation, or property, or family, or himself, while in such place, from forcible attack. The code enlarges the class, for at common law the dwelling-house only was within the privilege of such protection. Now, under the Code, the habitation, property, or family are expressly within it. The section is, ' If after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another can not be prevented, it shall be justifiable homicide to kill the person forcibly attacking and invading the property or habitation of another. But it must appear that such killing was absolutely necessary to prevent such attack and invasion, and that a serious in-

jury, was intended, or might accrue, to the person, property, or family of the person killing.' This applies to the right of defense growing out of an attack upon a man, or his property, or family, where they are at his home; the household goods, so to speak, are regarded with peculiar sanctity in the protection of the law. For life would be without object if home and family could be invaded and the father could not slay the invader. The right which Chatham boasted for the English citizen in his castle, has come down as an heritage of the common law, and is the same found in section 4266, enlarged in the language, though not changed in effect."

. In the case of *Thomas* v. *State,* 91 *Ga.* 204 (2), 205 (18 S. E. 305), a ruling identical with that in *Davis* v. *State,* supra, was made — that " generally the killing of an officer or other person, to prevent an illegal arrest, is not murder, but manslaughter." In delivering the opinion of the court Chief Justice Bleckley said: " The evidence indicates that the offence for which the policeman was endeavoring to arrest the accused, when the shooting occurred, was larceny of money and property from the house. If this was the offense, and if the effects stolen were of less value than $50.00, the arrest contemplated was not for a felony, but for a misdemeanor only. The policeman had no warrant, nor was the offence committed in his presence. This being so, he had no legal authority to make any arrest, unless it was reasonably proper to do so in order to prevent a failure of justice for want of an officer to issue a warrant. Code, section 4723. With ample time and opportunity to obtain a warrant after he was informed of the offense, and before he commenced looking out for the offender, the policeman had no right to proceed without it. He could not attempt an illegal arrest, even for a real crime, and then justify the attempt on the ground that the person sought to be arrested would not stand still until the arrest was made, but ran away to avoid it. To call this endeavoring to escape, and to treat it as legalizing what would otherwise be an illegal arrest, would be going round in a circle. Every man, however guilty, has a right to shun an illegal arrest by flight. The exercise of this right should not, and would not, subject him to be arrested as a fugitive. A policeman stands upon the footing of those public officers, such as sheriffs or constables, whose duty it is to make arrests. Generally it is not murder, but

manslaughter, to kill an officer or other person to prevent an illegal arrest. 1 East ·P. C. 310; 1 Russ. on Crimes, *798, 803; 1 Whart. Cr. Law, § 414; Roberts *v.* The State, 14 Mo. 138, s. c. 55 Am. Dec. 97; Jones *v.* The State, 14 Mo. 409; Commonwealth *v.* Drew, 4 Mass. 396; Commonwealth *v.* Carey, 12 Cush. 246; Commonwealth *v.* McLaughlin, Ib. 615; Rafferty *v.* The People, 69 Ill. 111, and 72 Ib. 37." Chief Justice Bleckley further said: " No one who properly appreciates the sacredness of personal liberty, and the jealousy of the law in guarding the same, can doubt that as a general rule the law requires a warrant in order to render an arrest legal, whether it be made by a policeman or any public officer. Only three exceptions to this rule are recognized by the code. See section 4723. The first is, where an offence is committed in the officer's presence; the second, where the offender is endeavoring to escape; and the third, where from other cause there is likely to be a failure of justice for want of an officer to issue a warrant. Where an arrest for a past offence is intended, and there is no present emergency, no want of time or opportunity for obtaining a warrant, why should a policeman be allowed to dispense with a warrant when other officers of the law could not?'" And see *Franklin* v. *Amerson,* 118 *Ga.* 860 (2) (45 S. E. 698); *Croom* v. *State,* 85 *Ga.* 718 (11 S. E. 1035, 21 Am. St. R. 179); *Williford* v. *State,* 121 *Ga.* 173 (48 S. E. 962).

In *Adams* v. *State,* 121 *Ga.* 163 (3), it was held: " Where the circumstances are such that a lawful arrest can not be made except under warrant, the warrant must, at the time of making the arrest, be in the possession of the arresting officer, or of another in the neighborhood with whom he is acting in concert. For the purpose of making an arrest, a warrant is not in the possession of the officer when it is in his house some distance from the scene of the arrest." Other cases could be cited to the same effect as the foregoing.

It appears from the evidence in this case that Macie Giddens was not charged with a felony, but with a misdemeanor; the offense had not been committed in the presence of W. P. Giddens, deceased, who attempted to arrest him; the defendant was not endeavoring to escape, and a warrant had actually been issued for his arrest, and the warrant was not in the hands of the constable, but was in the hands of the.sheriff of the county, a number of miles

away. Under these circumstances neither the deceased nor those who were with him had any authority to arrest the defendant, except under the warrant which had been issued against him; and unless the arresting officer and the others with whom he was acting in concert had been in possession of the warrant and in a position to show it to the defendant upon demand, the attempted arrest was not lawful. While, as stated above, a warrant had been issued, the constable was not in possession of it so as to derive any authority from it in order to make the arrest. See note to the case of Keady v. People, 66 L. R. A. 357 a, 370 d 1 (32 Colo. 57, 74 Pac. 892). Nor was the warrant for the arrest of the defendant in the present case in the possession of either one of the posse acting° in concert with the constable who was killed.

The charge of the court in this case was a full and fair presentation of the law of murder and of manslaughter, together with the contentions of the defendant and his rights of defense under the evidence in this case, and we find no error in the assignment with reference to the single excerpt from the charge about which complaint is made; and we base our conclusion that a reversal of the judgment should be had and a new trial granted, solely upon the ground that the evidence does not authorize a verdict of murder against the defendant. In stating the contentions of the defendant the court said: " The defendant in this case sets up and contends that he received information that Mr. Alred, on whose place he had been working, 'had it in for him;' that he went away and stayed for two months, and returned on December 23; that he remained at home until the date of the homicide, being informed in the meantime that it was dangerous for him to stay around there; that on the night of the shooting he was in his mother's home; that he had been lying down for about two hours when some one knocked at the door, and, without stating who it was, declared, 'I am going to have Macie Giddens out of this house to-night;' that several persons were going around the house on the outside, two or three going one way and two or three going in another way; that he was frightened when he saw them, Mr. Alred being in the party, and believing that Mr. Alred 'had it in for him;' and that some one lunged against the door; that he did not know it was W. P. Giddens, and did not know that there were any indictments against him for anything, nor that there

was any misdemeanor charge outstanding against him; that on the night of the shooting when the door was opened he fired and fled, and that later he heard there were indictments against him, that he had shot W. P. Giddens. He further contends that W. P. Giddens, when he appeared at the door, did not call any one, and that when he, the defendant, saw the people surrounding his home, Mr. Alred being in the party, and being a boy, he was frightened, thinking they were about to mob him, and that in the fears of a reasonable man and in the defense of himself and to prevent his home from attack or invasion he shot and ran from the scene of the shooting." The recital of these contentions is authorized from the evidence and the statement of the defendant.

And art. 1, sec. 1, par. 2, of the constitution of the State of Georgia (Civil Code of 1910, § 6358), provides that "Protection to person and property is the paramount duty of government, and shall be impartial and complete." Paragraph 16 of the same article and section provides that " The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or. affirmation, properly describing the place or places to be searched and the persons or things to be seized." It will be seen that the constitution of the State of Georgia expressly declares the right of the people to be secure in their persons and houses, etc., against unlawful seizures and searches. Under the undisputed evidence in this case the defendant was, on the night of the unfortunate homicide, in his own home within the protection of the law, when five men came to his home without warrant or authority of law, and sought to and did break into his home, the purpose of which is not entirely clear; and he had the legal right under such circumstances to defend his person and his home, and to resist any effort on the part of the deceased and those acting in concert with him to take him into custody or to break down the door of his house for the purpose of an illegal arrest, or any other illegal purpose. It is as much the duty of the courts of the country to protect the innocent as it is to punish the guilty; and so far as the record discloses, there was no excuse or justification on the part of the deceased, and those acting in concert with him, for invading the home of the defendant without lawful warrant or

authority; and if the courts do not protect its citizens who are in the peace of the State in their lives, their liberties, and their property, then the provisions of the constitution which we have just quoted are dead letters and might as well be stricken from our constitution.

In *Porter* v. *State,* 124 *Ga.* 297, 305 (52 S. E. 283, 2 L. R. A. (N. S.) 730), the rule is thus stated: " To slay an officer who is without authority of law to make an arrest for a misdemeanor, where the motive of the slayer is merely to avoid an illegal arrest, would be manslaughter, and not murder." Under the evidence in this case the defendant is guilty of manslaughter, if guilty of anything. From what has been said we feel constrained to hold that the verdict finding the defendant guilty of murder is contrary to law and the evidence, and that the court erred in refusing a new trial on this ground.

*Judgment reversed. All the Justices concur, except Gilbert, J., absent.*