None of the grounds of the amended motion for a new trial show any cause for reversal; the evidence amply authorized the verdict, and the judgment overruling the motion for a new trial will not be disturbed.
 No. 16487. FEBRUARY 15, 1949. REHEARING DENIED MARCH 16, 1949.
Junior Moore, alias Shine, was indicted, tried, and convicted, in Bibb Superior Court, of the murder of W. L. O'Cain, and sentenced to be electrocuted. The case comes here on exceptions *Page 38 
to the overruling of the motion for a new trial as amended. Briefly stated, the record discloses substantially the following facts:
Roy Stanley, the negro who lived in the house by the side of which the deceased, W. L. O'Cain, was killed about 9 p. m. on the night of June 11, 1948, testified for the State: That he came home from work late that afternoon and then went to the grocery store. He returned to his house early that evening. Shortly thereafter the defendant came to his house and on in to the front room, and he saw him flirting with his wife, they were winking at each other. The witness testified that he got mad at this and ordered the defendant out of his house and pulled his wife back in the back room and scolded her. The defendant gave a different version of this occurrence in his statement, which is hereinafter quoted.
Louis Horne and his sister testified that the defendant came by their house with the rifle, and after some words about what he was doing with the rifle they sent and called the law, Louis Horne and his sister stating that the defendant had made the statement that he would kill them too.
Ben Ong testified for the State that he was a city policeman in the detective department, and was cruising in a radio car with the deceased, W. L. O'Cain, also a city policeman in the detective department, when they heard a call come in on the radio for another car, but decided that they would answer the call. This call was heard about 9 p. m. on June 11, 1948, and they started out in the direction of the Stanley house where this shooting later occurred, both of them being in plain clothes; and the witness stated that they immediately went on out to the scene in question, going first over to the house of Louis Horne, from whom the call had come, and then going around to a negro cafe several blocks away and then coming back again, with Louis Horne in the car, and parking on the left side of the street immediately in front of the house of Roy Stanley, which was No. 1638 First Street; that O'Cain was sitting on the front seat beside him; that he, the witness, was driving the car; that, after he parked the car he got out on the left side of the car and O'Cain got out on the right side of the car; that then he went to the right of the Stanley house, there *Page 39 
being a number of houses in a row and being approximately 25 feet apart; and that O'Cain started around to the left side of the house of Roy Stanley (sometimes called Bud Stanley); and that there was a truck parked on the left side of the Stanley house in between that house and the next house to the left. The witness stated: "I told Mr. O'Cain that I would go to the right of the house and for him to go to the left of the house and we would meet in the back yard and try to catch the negro. That was the usual procedure we make when there are just two of us. I went between those two houses to the right and Mr. O'Cain was right there (indicating)." The witness had already testified that the call which they received was to investigate a negro with a shotgun. He then testified: "When we got out of the car, I started around the house between 1638 and the house that is nearer to town, 1634, and Mr. O'Cain went between these two houses, 1638 and 1640. I went between 1638 and 1634. 1634 is nearer to town than 1638. I went to the right of 1638. I was right here, and Mr. O'Cain was right there (indicating). Mr. Anderson asked me, `How far are these houses from the street, is any curb line there?' and I told him, `There is a ditch, no sidewalk.' I can give you the dimensions from the ditch to the steps of the house. It is approximately 18 feet from the street to the house. That is from the ditch back to the steps, not to the house. After I started around to the right of this house, Mr. O'Cain started to the left and I did see him before I heard the shot — I was in full view of him all the time. I never did get out of view of him. I was not looking at him all the time. There is a space across this porch, and I could see across the porch. It was bright. Mr. O'Cain never did get beyond the edge of the porch and out of my sight. I was not looking directly at him when the shots were fired. I know where I found him. I know exactly where he (Mr. O'Cain) was when the shots were fired. He had not entered between the houses. He was still between the two porches and was still talking to the negro preacher. He had not finished talking with the negro preacher and gone on when the shots were fired, he was still talking to him when the shots were fired. I know he was talking to the preacher because I could hear him talking and while he was talking I heard the shots, I am certain I heard Mr. *Page 40 
O'Cain talking, because at the finish of his conversation he asked the preacher whether he had seen a negro pass through there with a gun. As to the lapse of time between that statement and when I heard the gun fire, it was immediately after O'Cain had asked the preacher if he had seen a negro pass with a gun. A person would not have had time to take two or three steps." He stated that Mr. O'Cain had a flashlight with him. This witness testified further that, after he heard the two shots and heard Mr. O'Cain call to him, he ran around to Mr. O'Cain and found him slumping to the ground, and then when he got help, taking him to the car and immediately to the hospital where he stayed with him until he died later that night. Other witnesses introduced by the State told of the other detectives and policemen who went out to hunt the person who had done the shooting, and of finding him about midnight in another house lying on a bed asleep, this other house being only two or three blocks away from the scene of the shooting. They took him into custody at once.
That portion of the statement of the defendant to the jury material to the questions here presented, which was substantially the same statement he had previously made to the officers, was as follows: "Well, the evening when all of this come up, that evening I was down town and I met Bud and I found him in a Broadway beer parlor. He was standing up there, and he asked me, would I buy a drink of liquor and he would pay me for it after he got home, and I said I would. We went in the Broadway liquor store and bought a pint of liquor and then went in the Broadway beer parlor and drank it, and he asked was I going on with him, and I said, `No,' I would be on home after a while, and I told him I would stop by when I went home. After I got to his house he first was not there, so I went on around home, and I come back down on Five Points corner and I was talking to some more boys and they were going up the hill on a truck, and I rode on up there with them and I got up to their house, I gets off the truck. There his door was open and there was no one in the front room, and Mary came to the door first and I stood there in the door with my hand on the door knob and I asked her where was Bud, and she said he was in the back, and I told Mary to tell him I wanted to see him and I *Page 41 
asked him was he ready to let me have the money he was going to pay me down town for the liquor. He said, `We have done drunk the liquor up now, there is no need of me paying you now, next time I will buy some,' and I said, `No, you pay me for this,' and he said, `I will not pay you nothing.' He said, `You get on out of my damn house and keep out,' and I got mad and I run across over the fence and got my brother's rifle, and I came back on Bright Street and I stopped where some chairs were under the trees, and I stopped there with one `feet' on the chair and Louis Horne came up, I reckon he was coming from work, and Louis asked, what was I doing in his yard, and I said I wanted to see Bud, that we had had an argument over some money, and I walked out of his yard on the edge of First Street and he called his sister to the door; his sister asked, what was the matter, and I said `Nothing' and she said, `Get on out of the yard before I call the law,' and I got on out of the yard, and she went back in the house, and I walked on up the street on the right-hand side until I got to the fourth and fifth houses, and I went down through the back of the houses and I stayed around there — I don't know how long it was but quite a while I stopped around there, but I sat down on some crossties. Shortly after then I made up my mind to go home. I went by the house and got a drink of water and went through the back of the houses in the dark. I could see a shadow that came out from behind the truck after I got to the corner of the building, it backed up behind the truck, and I backed behind the pillar of the post, and I know if anybody could have been there there could not be anybody but Bud. I could not see no more than the shadow behind the truck. After that I shot twice up in between the truck and the house and I run out across the field, and when I got to a little trap fence I fell, and I lost my rifle and my hat, and I walked on down to Telfair Street and went on down Telfair to the railroad to Riley Johnson's house and I stayed up there quite a while until I went to sleep. I didn't know anything, all I know was I shot twice. I didn't know I hit anybody or nothing. I was expecting Bud. I knew that he had a gun, he had been toting it around in his pocket. He has got a 32 with a pearl handle. He used to drive for the Atlantic Ice Coal Company and he carried a pistol in the truck with him. *Page 42 
After then I went on to this house and I stayed until the cops come and got me. They ain't told me anything what happened until they got to the City Hall, and they said, `Do you know what you have done did?' and I said, `No,' and he said, `Do you know you have done shot a cop?' and I said, `No, I have not seen a cop,' and he said, `You have shot Mr. O'Cain,' and I said, `No, I have not even seen any cop, h —, me and a boy was in an argument up there on First Street, and I went and got my rifle,' and they brought me from the City Hall up here and they put me upstairs. They gave me a few licks side the head that deafened me a little bit, and they came back the next day and questioned me and I told them like it was after that. That is all."
The undisputed evidence in the case indicates that no warrant was ever issued for the arrest of the defendant, Mr. Ong and his companion, Mr. O'Cain, who was killed, having heard the radio call and gone immediately out to the vicinity where the killing occurred, and not having gone to any magistrate for a warrant. The evidence does not disclose that an officer for issuing a warrant was not readily available. Neither does the evidence disclose that the defendant had been guilty of the commission of any crime, prior to the arrival of the officers, of any higher dignity than that of a misdemeanor, having a gun, or pointing it at another, or disorderly conduct. As stated in the brief of counsel for the defendant: "The evidence indicates that the deceased and his companion officer had never caught sight of this defendant, and, therefore, that he was not committing any crime in their presence, nor does the evidence indicate that he was trying to escape from them. Except for the evidence of Madison Wilson, none of the other evidence indicates that the defendant knew that he was being approached by any persons, and these two were admittedly in plain clothes. Nor does the evidence indicate that they made any attempt to make their presence known to the defendant, nor to inform him in any way that they were officers or that they were seeking to make an arrest, or that he had this knowledge from any other source or any grounds to believe that they were officers seeking to arrest him."
The first, second, and third grounds of the amended motion *Page 43 
for a new trial assign error upon the failure of the trial court to give in charge to the jury three written requests to charge, as follows:
(1) "I charge you that under the undisputed evidence in this case no warrant was issued for the arrest of the defendant in this case, no crime was committed in the presence of the deceased arresting officer, nor was the defendant attempting to escape, nor does the evidence disclose that an officer for issuing a warrant was not available. I therefore charge you that, under the undisputed evidence, the deceased was attempting to make an unauthorized and illegal arrest, and you could not find this defendant guilty of murder unless you believe that the evidence shows some previous or express malice. Unless you believe that, the most you could find him guilty of would be voluntary manslaughter. I am not instructing you that you should find him guilty of manslaughter, but whether you should or not would depend on your version of the evidence and the other principles of law I have given or will give you in charge on that subject. I am instructing you that, unless you believe from the evidence that the defendant has previous or express malice, you could not find him guilty of murder."
(2) "I charge you that no officer, and this would include a city policeman, has any authority, without a warrant, to arrest a person charged with a misdemeanor, unless such offense was committed in his presence, or unless the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant."
(3) "Even if an officer is undertaking to make a legal or authorized arrest of a person charged with a crime, I charge you that such officer should have informed such person that he was an officer of the law and of his intention to make an arrest. If the defendant already knew that he was such an officer, or had reasonable grounds of belief that he was and that he intended to make an arrest, this would dispense with the necessity of the officer informing him of these facts. But if you should believe, under a preponderance of the evidence, that the deceased in this case did not notify the defendant that he was an officer and intending to make an arrest, and if you should further believe from the evidence that the defendant did not know *Page 44 
these facts from other sources or have a reasonable ground to believe them, and if you also believe that the killing was done suddenly, and on a dark night, and was without malice express or implied, then I charge you that, even though the officer was legally authorized to make the arrest, the defendant in shooting him would not be guilty of murder, but at most would be guilty of voluntary manslaughter. I am not instructing you that you should find him guilty of manslaughter, but whether you should or not would depend on your version of the evidence and the other principles of law I have given or will give you in charge on that subject."
The fourth special ground is an amplification of the general grounds, wherein it is insisted that, under the principles of law set out in the three requests to charge, and the evidence introduced upon the trial of the case, the defendant could not have been legally guilty of any crime greater than that of voluntary manslaughter, and that the verdict finding the defendant guilty of murder is contrary to law and contrary to evidence.
Since all the grounds of the amended motion for a new trial deal with the same subject-matter, the rules of law applicable to an illegal arrest and the right of the one sought to be arrested to resist the same, the duty of officers to give notice of their official capacity and that an arrest is intended, and that under these rules and the evidence in this case the defendant could not have been legally convicted of any greater crime than that of voluntary manslaughter, these grounds will be considered together.
While the requests to charge presented by counsel for the defendant embodied substantially correct statements of the rules of law therein dealt with, as shown by the authorities cited by counsel (Code, § 27-207; Wall v. State, 153 Ga. 309, 112 S.E. 142; Porter v. State, 124 Ga. 297, 52 S.E. 283;Giddens v. State, 154 Ga. 54, 113 S.E. 386; McIntosh v.State, 191 Ga. 736, 13 S.E.2d 770; Mullis v. State,196 Ga. 569, 27 S.E.2d 91), a *Page 45 
failure to charge as requested is never error where the requested charge is not properly adjusted or applicable to the facts of the particular case, even though it embody a correct principle of law. Lyon v. State, 22 Ga. 399 (2); Smith v. SatillaPecan Orchard Stock Co., 152 Ga. 538 (6) (110 S.E. 303);Lester v. Baxter, 184 Ga. 368 (3) (191 S.E. 429, 110 A.L.R. 493); Lefkoff v. Sicro, 189 Ga. 554 (6) (6 S.E.2d 687, 133 A.L.R. 738). In the instant case, the requests to charge were not applicable to the facts of the case, for the reasons that there was no illegal arrest involved and no effort on the part of the defendant to resist an illegal arrest, for the defendant could not resist that which did not take place. The very argument, presented to sustain the contention that an arrest by the officers under the circumstances disclosed by the evidence would have been illegal, refutes the idea that there was an arrest, for in the first ground of the amended motion for a new trial it is stated: "Movant contends that from the evidence it appears that the two arresting officers had never seen this defendant, and it therefore appears that no crime was being committed by him in their presence." A similar statement is contained in the second and third grounds of the amended motion, and it is borne out by the evidence. While it is inferable from the evidence that it was probably the intention of the deceased and his companion officer to arrest the defendant, if and when they found him, certainly they could not have been in the act of arresting or attempting to arrest a person whom they had never seen. A statement is also contained in the amended motion and in the brief of counsel; "There is no evidence to show that the defendant knew that a police car was coming up or that police or other officers were coming after him to catch him or arrest him. The defendant's statement on this point seems to be undisputed, and that is that he did not know that he was being approached by police officers or any officers who were seeking to arrest him." These statements are also borne out by the record, and the defendant could not have been resisting an arrest which was not even being attempted, and could not have been resisting something which, even had it occurred, he knew nothing about. The requests to charge were, therefore, not adjusted to the facts of the case as disclosed by the evidence and statement of the defendant, and *Page 46 
were properly refused. The trial court fully charged the jury on the law of murder, voluntary manslaughter (except as applied to the resistance of an illegal arrest), and justifiable homicide. No complaint is made of the charge as given; it clearly submitted the case to the jury, and was most favorable to the defendant. From the statement of the defendant it appears that, at the time he fired the fatal shot, he thought he was shooting one Roy (Bud) Stanley, with whom a short time previously he had a dispute about reimbursement for some whisky which the defendant claims he had purchased and he and Stanley had consumed on Stanley's promise to repay him. He does not contend that Stanley had at that time made any assault upon him, or even any threat — but merely ordered him out of his house; that this made the defendant mad, and he went and procured his brother's rifle and came back behind Stanley's house; that as he started to leave to go home, he saw someone pass between the house and a truck parked beside the house, and thinking that the person was Stanley, he fired the rifle twice and ran. The statement of the defendant was practically a plea of guilty to the crime of murder, for if he had shot the person whom he thought he was shooting he would not have been justifiable under the circumstances detailed by him and as shown by the other evidence, and there was nothing disclosed by the evidence or the defendant's statement that would reduce the crime to voluntary manslaughter. At most there had been only words between the defendant and Stanley. The Code, § 26-1007, specifically provides: "Provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder." Thus, neither the evidence nor the statement of the defendant showed justification or mitigation if the person killed had been Stanley, the one at whom the defendant thought he was shooting. In Hamilton v. State, 129 Ga. 747 (2) (59 S.E. 803), it is held: "There being evidence from which the jury might have found that the accused shot at Owens, but killed Robinson, it was not error for the court to charge as follows: `It would make no difference, gentlemen of the jury, whether the deceased was the man he really intended to kill or not, provided that you find that he did shoot at some member of that crowd with a felonious intent, and without *Page 47 
being justified or excused under the law, — he would be held accountable. In other words, if a man attempts to kill another without justification, without provocation and not under circumstances of mitigation, and in pursuance of that effort shoots, and, instead of hitting the man at whom he shoots, hits and kills another, he is guilty. The killing of the other is measured by the same standard as though he had killed the one originally intended.' Charlon v. State, 106 Ga. 400
(32 S.E. 347)."
The evidence amply authorized the verdict, and none of the grounds of the motion for a new trial show any error. The judgment overruling the motion for a new trial will not be disturbed. Middlebrooks v. State, 118 Ga. 772
(45 S.E. 607); Harris v. State, 119 Ga. 114 (45 S.E. 973).
Judgment affirmed. All the Justices concur.