309 Ga. 368
FINAL COPY

S20A0441. CALMER v. THE STATE.

ELLINGTON, Justice.

Christopher Calmer shot two Monroe County sheriff's deputies, Michael Norris and Jeffrey Wilson, after they opened the door to his residence in response to a 911 call. Wilson recovered, but Norris died of his injuries. Following a jury trial, Calmer was convicted of malice murder and other offenses arising out of the shooting.[1] Calmer contends on appeal that the trial court erred by

---

[1] The crimes occurred on September 13, 2014. On May 12, 2015, a Monroe County grand jury indicted Calmer for malice murder, felony murder predicated on aggravated assault, felony murder predicated on obstruction of a law enforcement officer, aggravated assault on a peace officer, and possession of a firearm during the commission of a felony in connection with the shooting of Norris. The grand jury also indicted Calmer for aggravated battery, criminal attempt to commit murder, aggravated assault on a peace officer, and possession of a firearm during the commission of a felony in connection with the shooting of Wilson. On September 22, 2015, the State filed a notice of its intent to seek the death penalty. Calmer was tried before a jury in June 2017. The jury found Calmer guilty of all charges. During the sentencing phase, the jury recommended a sentence of life without parole for the murder of Norris. On June 14, 2017, the trial court sentenced Calmer to life without parole for malice murder. The trial court purported to merge the two counts of felony murder into the count of malice murder, although the felony murder counts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369,

failing to charge the jury on justification and on the lesser offenses of voluntary and involuntary manslaughter. He also contends that the court erred in denying his motion for immunity from prosecution. We affirm for the reasons set forth below.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. In 2014, Calmer lived with his parents in their Monroe County home. He suffered from chronic pain following a surgical procedure. In September, Calmer's uncle, Tommie McRae, came to visit Calmer's mother for several days. McRae saw that Calmer was acting in an extremely agitated manner. Calmer remarked about how much pain he was in and said that he could not live that way.

Days before the shooting, Calmer told his mother that he

---

372 (4) (434 SE2d 479) (1993). The aggravated assault on Norris merged into the malice murder count, although the sentencing order purports to merge the count of aggravated assault into the count of felony murder predicated on aggravated assault. See id. at 373-374 (5). Calmer was sentenced to consecutive sentences totaling 80 years on the remaining counts. On July 11, 2017, Calmer filed a motion for new trial, which he amended on November 15, 2018. Following a hearing, the trial court denied the motion in an order filed July 30, 2019, and Calmer filed a timely appeal. The case was docketed in this Court to the term beginning in December 2019, and orally argued on April 22, 2020.

wanted the police to be called so he could shoot at them and they would shoot back. And the day before the shooting, Calmer showed a gun and a bottle of pills to his mother, and McRae and said that he needed to get relief and one of those two things would give it to him.

On the day of the shooting, September 13, 2014, Calmer's mother, his aunt, and McRae were on the back porch of the house when Calmer came outside and put a handgun under his chin, then to his temple, and asked, "Are you scared now?" After Calmer went back inside the house, Calmer's mother and McRae agreed that McRae should call 911. She was worried that Calmer would shoot himself. McRae called 911 and told the operator that Calmer had a gun, was threatening to commit suicide, and wanted to shoot at police officers so that they would kill him. Calmer's mother went inside the house to tell her husband that the police had been called.

Deputies Norris and Wilson, both of whom were in uniform, responded. Upon arriving at the Calmer residence, they spoke with McRae, who told the deputies that his nephew was "inside acting

crazy, [and] had a gun to his head threatening suicide[.]"

The deputies drew their service weapons and walked up the ramp to the front door of the house. Norris pushed the door open as Wilson looked through the window into the living room. Wilson saw the silhouette of a man sitting in a chair with his back toward the officers. One of the officers said "Chris," at which point Calmer immediately stood up, turned around, and started shooting. According to Wilson, and consistent with the video of the shooting captured by the dashboard video of Wilson's patrol car, the officers had not then entered the house, but were "at the door." Deputy Norris fell inside the doorway while Wilson and Calmer exchanged gunfire. Wilson was struck in the leg, fell on the ramp, and got up and made his way to the patrol car. Calmer stepped over Norris's body to come outside and shoot at Wilson, who took cover behind his car. Calmer went back inside the house and, after a period of time, came outside, raised his hands, and surrendered.

Deputy Wilson was shot three times but survived. Deputy Norris died from a gunshot wound to the head.

1. Calmer does not challenge the sufficiency of the evidence to support his convictions. Nevertheless, in accordance with this Court's current practice in appeals of murder cases, we have reviewed the record and conclude that the evidence, as summarized above, was sufficient to enable a rational trier of fact to find Calmer guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia,* 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Calmer contends that the trial court erred in failing to give his written requests to charge the jury on principles of justification, specifically the defense of habitation, the right to resist an illegal arrest, the right to defend himself, and the right to stand his ground (no duty to retreat). "To authorize a requested jury instruction, there need only be slight evidence to support the theory of the charge, and the necessary evidence may be presented by the State, the defendant, or both." *Collins v. State,* 308 Ga. 515, 519 (2) (842 SE2d 275) (2020) (citation and punctuation omitted). See *Koritta v. State,* 263 Ga. 703, 704-705 (438 SE2d 68) (1994) ("The evidence necessary

to justify a jury charge need only be enough to enable the trier of fact to carry on a legitimate process of reasoning" (citation and punctuation omitted)). "Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law." *McClure v. State*, 306 Ga. 856, 863 (1) (834 SE2d 96) (2019) (citation and punctuation omitted).

(a) Calmer contends that the trial court erred in failing to give the pattern jury charge on defense of habitation. OCGA § 16-3-23 (2), in pertinent part, provides:

> A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, such person is justified in the use of force which is intended or likely to cause death or great bodily harm only if . . . [t]hat force is used against another person who is not a member of the family or household and who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using such force knew or had reason to believe that an unlawful and forcible entry occurred[.][2]

---

[2] OCGA § 16-3-23 contemplates two other circumstances in which the use of deadly force is authorized in defense of habitation:

As the plain language of the statute shows, for the use of deadly force to be justified, "the entry must . . . in fact be unlawful, as well as forcible[.]" *Fair v. State*, 288 Ga. 244, 258 (2) (702 SE2d 420) (2010).

Here, the State's evidence did not show that the deputies entered Calmer's home unlawfully, and Calmer did not present evidence raising the issue. As we have explained, "[t]he responsibility of producing evidence of an affirmative defense and the burden of persuasion by proof beyond a reasonable doubt are two

---

(1) The entry [into a habitation] is made or attempted in a violent and tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence;  . . . or

(3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

As to these provisions, "the evidence must establish that the defendant had an objective reasonable belief that the assailant is entering to assault, to offer personal violence, or to commit a felony and that deadly force is necessary to prevent one of those acts." *Clark v. State*, 307 Ga. 537, 541 (1) (837 SE2d 265) (2019) (citation, punctuation and emphasis omitted).  Calmer does not contend that there was any evidence to satisfy either element of OCGA § 16-3-23 (1) or (3).

distinct and separate concepts. The first is placed squarely on the defendant unless the state's evidence raised the issue." *Adams v. State*, 288 Ga. 695, 697 (1) (707 SE2d 359) (2011) (citation and punctuation omitted). See OCGA § 16-1-3 (1) ("'Affirmative defense' means, with respect to any affirmative defense authorized in [Title 16], unless the state's evidence raises the issue invoking the alleged defense, the defendant must present evidence thereon to raise the issue."). Compare OCGA § 17-5-30 (b) (in a motion to suppress, "the burden of proving that the search and seizure were lawful shall be on the state").

The evidence at trial showed that Calmer's mother resided in the home. While on the back porch, she and McRae agreed that McRae should call 911 to get Calmer help. She was concerned that Calmer was going to shoot himself and might die. McRae left the porch to call 911, and Calmer's mother went in the house to tell her bedridden husband that the police had been called. McRae testified that he told Calmer's mother that "we have to call 911 . . . to get that gun away from [Calmer]."

Neither party asked Calmer's mother if the deputies lacked her consent to enter her home, and McRae's testimony did not show that the deputies lacked her consent to enter. As discussed above, the evidence showed that the deputies were called to the residence with the knowledge and consent of Calmer's mother for the purpose of helping Calmer, who was inside. Because Calmer does not point to slight evidence that the deputies acted unlawfully in entering the home, the trial court did not err in failing to charge the jury on defense of habitation.

(b) Calmer contends that the trial court erred in refusing to give the pattern jury charge on the right to resist an illegal arrest. See *Mullis v. State*, 196 Ga. 569, 579 (7) (27 SE2d 91) (1943) ("Where an arrest is not lawful, the person sought to be so arrested, contrary to his right if the arrest had been lawful, has the right to resist, and in doing so has a right to resist force with force proportionate to that being used in unlawfully detaining him." (punctuation omitted)). There was, however, no evidence that the deputies were at the residence for the purpose of arresting Calmer or that the deputies

attempted to arrest him before he opened fire. Deputy Wilson testified at trial that he had been on numerous suicide calls; that he was at the Calmer residence to "help" as a "first responder"; and that "[s]uicide is not a crime." According to Deputy Wilson, he and Deputy Norris had drawn their weapons for their own protection, but they were not there to make an arrest. As there was no evidence that the deputies arrested or attempted to arrest Calmer, the trial court did not err in failing to give the requested charge on the right to resist an illegal arrest. See *Moore v. State*, 205 Ga. 37, 45 (52 SE2d 282) (1949) ("[T]he requests to charge were not applicable to the facts of the case, for the reasons that there was no illegal arrest involved and no effort on the part of the defendant to resist an illegal arrest[.]").

(c) Calmer also contends that the trial court erred in refusing to give his requested instructions on self-defense[3] and no duty to

---

[3] The statute on the use of force in defense of self provides that a person "is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person."

retreat.[4] McRae testified at trial that after the deputies made their way to the front door, he heard one of them call out "Chris," and then "a loud banging on the door or a slamming of the door, or a slamming of it open or close or a kick on the door or something." Deputy Wilson's testimony at trial showed that the two deputies drew their weapons before approaching the front door and that Calmer was sitting in a chair and facing away from the deputies when they made their presence known. Calmer posits that a trier of fact could infer that he reasonably believed that the two unidentified armed figures bursting into his home intended to cause him harm and that it was necessary to fire his weapon toward them.

Assuming, but not deciding, that the testimony of the State's

---

OCGA § 16-3-21 (a).

[4] The statute on no duty to retreat provides:

> A person who uses threats or force in accordance with Code Section 16-3-21, relating to the use of force in defense of self or others, Code Section 16-3-23, relating to the use of force in defense of a habitation, or Code Section 16-3-24, relating to the use of force in defense of property other than a habitation, has no duty to retreat and has the right to stand his or her ground and use force as provided in said Code sections, including deadly force.

OCGA § 16-3-23.1.

witnesses provided the slight evidence necessary to support the requested charges on self-defense and no duty to retreat, the trial court's failure to give the charges was harmless. "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Shah v. State,* 300 Ga. 14, 21 (2) (b) (793 SE2d 81) (2016) (citations and punctuation omitted). For this purpose, "we assess the evidence from the viewpoint of reasonable jurors." *Henry v. State*, 307 Ga. 140, 146 (2) (c) (834 SE2d 861) (2019). Here, any weak inference that Calmer acted to prevent death or great bodily injury to himself is wholly undercut by other evidence to the contrary. Calmer's mother testified that Calmer had stated that he wanted police to come to the house so he could shoot them. The deputies were dressed in their uniforms and announced their presence by calling out Calmer's first name, even assuming that the sound McRae heard thereafter was the sound of the deputies loudly opening the door. And after shooting Deputy Norris in the head, Calmer stepped over his body and came outside to continue to shoot at Deputy Wilson. We

conclude that it was highly probable that the trial court's instructional error, if any, did not contribute to the verdict.

3. Calmer maintains that the trial court erred in failing to give his written requests to charge the lesser offenses of voluntary and involuntary manslaughter. "[A] written request to charge a lesser included offense must always be given if there is any evidence that the defendant is guilty of the lesser included offense." *Bryson v. Jackson*, 299 Ga. 751, 755 (2) (d) (791 SE2d 43) (2016) (citation and punctuation omitted).

(a) Calmer argues that evidence showing that "two armed men burst[ ] through" the door of his residence unannounced was sufficient to excite such passion and provocation to warrant a charge on voluntary manslaughter.[5] "The distinguishing characteristic

---

[5] Georgia's voluntary manslaughter statute, OCGA § 16-5-2 (a), provides in pertinent part:

> A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person . . . .

between [voluntary manslaughter and self-defense] is whether the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself. Only where this is shown will a charge on voluntary manslaughter be warranted." *Worthem v. State*, 270 Ga. 469, 471 (2) (509 SE2d 922) (1999). Here, the evidence showed that after the deputies called out his name, Calmer stood up from his chair and immediately shot and killed Deputy Norris. There is no evidence that Calmer knew the deputies, that they struggled or exchanged words, or that the deputies did anything to provoke Calmer. Compare *Webb v. State*, 284 Ga. 122, 126 (4) (663 SE2d 690) (2008) (where appellant's testimony showed that he was arguing with and swearing at the victim and a second individual, that he was shoved into a table, and that he felt as though the two men were going to beat him up, there was slight evidence of provocation and passion that would support a charge on voluntary manslaughter). Even assuming there was slight evidence that Calmer acted in self-defense, the evidence does not support an inference that he was acting passionately in response to a serious

provocation. See *Tarpley v. State*, 298 Ga. 442, 445 (3) (a) (782 SE2d 642) (2016) (no voluntary manslaughter charge was warranted where evidence showed that appellant was attempting to repel an attack, not that he was so angered that he reacted passionately). The trial court did not err in refusing to charge on voluntary manslaughter.

(b) Calmer argues that the trial court erred in failing to charge on involuntary manslaughter. The involuntary manslaughter statute, however, does not apply to an intentional shooting.[6] See *Washington v. State*, 249 Ga. 728, 729 (2) (292 SE2d 836) (1982).

---

[6] Georgia's involuntary manslaughter statute, OCGA § 16-5-3, provides:

(a) A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony. A person who commits the offense of involuntary manslaughter in the commission of an unlawful act, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years.

(b) A person commits the offense of involuntary manslaughter in the commission of a lawful act in an unlawful manner when he causes the death of another human being without any intention to do so, by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm.

Here, "[t]here is no evidence that the killing was the result of an unlawful act other than a felony; nor . . . the result of a lawful act carried out in an unlawful manner." Id. at 729-730 (2). Consequently, Calmer shows no error.

4. Calmer filed a pretrial motion for immunity from prosecution under OCGA § 16-3-24.2, which provides that a defendant is immune from criminal prosecution if he used justifiable force to protect himself or his home.[7] To avoid trial based on a justification defense presented at an immunity hearing, "a defendant bears the burden of showing that he is entitled to immunity under OCGA § 16-3-24.2 by a preponderance of the evidence." *Bunn v. State*, 284 Ga. 410, 413 (3) (667 SE2d 605) (2008).

Following an evidentiary hearing, the trial court denied the

---

[7] OCGA § 16-3-24.2 provides:
   A person who uses threats or force in accordance with Code Section 16-3-21 [self-defense], 16-3-23 [use of force in defense of habitation], 16-3-23.1 [no duty to retreat], or 16-3-24 [use of force in defense of property other than habitation] shall be immune from criminal prosecution therefor unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful by such person under Part 2 of Article 4 of Chapter 11 of this title.

motion. Calmer argues that the trial court erred in denying the motion because Calmer was justified in using deadly force in self-defense and to defend his home, and that the deputies' entry into his home was unlawful because it was for the purpose of effectuating an unlawful arrest. "In reviewing the denial of a motion for pretrial immunity, this Court must view the evidence in a light most favorable to the trial court's ruling." *Johnson v. State*, 304 Ga. 610, 613 (2) (820 SE2d 690) (2018) We "accept[ ] the trial court's findings with regard to questions of fact and credibility if there is any evidence to support them." Id.

The evidence at the motion hearing consisted of the testimony of Deputy Wilson, the dash-camera video from Wilson's patrol car, and recordings of the 911 call placed by McRae and corresponding radio traffic on the day of the shooting. Deputy Wilson's testimony showed that he and Deputy Norris were dispatched to the Calmer home by a report of a suicide attempt. Once there, they spoke with Calmer's uncle, who said that Calmer had a gun to his head, was "going to do it," and "if the police come up, he would take care of

them as well." According to Deputy Wilson, after the two uniformed officers approached the house, Deputy Norris gently pushed open the front door and Wilson said "Chris," after which Calmer immediately stood up and began to shoot. The trial court was authorized to find that Calmer failed to meet his burden of showing that he was entitled to immunity under OCGA § 16-3-24.2 in that evidence presented at the hearing supported the conclusion that Calmer was not in fear for his own safety, that the deputies did not enter or attempt to enter the home for the purpose of unlawfully arresting him, and that the deputies did not unlawfully and forcibly enter or attempt to unlawfully and forcibly enter the home. See *Arnold v. State*, 302 Ga. 129, 131 (1) (805 SE2d 94) (2017); *Sifuentes v. State*, 293 Ga. 441, 444 (2) (746 SE2d 127) (2013).

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 1, 2020.
Murder. Monroe Superior Court. Before Judge Wilson.

*Nathaniel L. Studelska, Gabrielle A. Pittman, Chelsea Henderson*, for appellant.

*Jonathan L. Adams, District Attorney, Cynthia T. Adams, Carolee R. Jordan, Elizabeth K. Presley, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.