308 Ga. 375
FINAL COPY

S19A1341.  SAWYER v. THE STATE.


BETHEL, Justice.

In July 2016, a jury found Devin Sawyer guilty of felony murder and other crimes in connection with the death of Michael Weeks, Jr.[1] Sawyer appeals, contending that his trial counsel's assistance was ineffective because counsel (1) did not object to a

---

[1] The crimes occurred on November 24, 2012. On February 19, 2013, Sawyer was indicted by a DeKalb County grand jury for (1) malice murder; (2) felony murder predicated on aggravated assault; (3) cruelty to children in the first degree; (4) aggravated assault based on strikes to the torso; (5) aggravated assault based on strikes to the head; (6) aggravated battery based on rendering the heart useless; (7) aggravated battery based on rendering the pancreas useless; and (8) aggravated battery based on rendering the liver useless. At a jury trial held in July 2016, Sawyer was found guilty of felony murder (Count 2), cruelty to children in the first degree (Count 3), aggravated assault (Count 4), and all three counts of aggravated battery. Sawyer was found not guilty of malice murder (Count 1) and aggravated assault (Count 5). Sawyer was sentenced to life imprisonment for felony murder and a consecutive sentence of 20 years for cruelty to children in the first degree. The trial court merged the aggravated assault (Count 4) and aggravated battery counts (Counts 6-8) into the felony murder count.

Sawyer filed a motion for new trial on July 20, 2016, and amended it through new counsel on August 6, 2018. After a hearing, the trial court denied the motion for new trial, as amended, on March 25, 2019. Sawyer then filed a timely notice of appeal, and the case was docketed in this Court for the August 2019 term and submitted for a decision on the briefs.

witness' purported comments on Sawyer's credibility; (2) did not object to testimony that allegedly placed Sawyer's character into evidence; and (3) did not object to hearsay testimony involving statements made by Weeks' mother. Because we determine that Sawyer's counsel did not render ineffective assistance to Sawyer, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that the victim, Weeks, was born on May 13, 2010. Danielle Calhoun, Weeks' mother, met Sawyer in 2011 and began a relationship with him. In 2012, Calhoun, Weeks, and Sawyer began living together.

While they were living together, Sawyer was "physical" toward Calhoun on one occasion, and Calhoun called the police regarding this incident. Calhoun's friend, Monica Fitzpatrick, encouraged Calhoun to leave Sawyer, but Calhoun said that they loved each other and continued living with him. On another occasion, Fitzpatrick noticed a scratch on Weeks' face and asked Calhoun about it. Calhoun told Fitzpatrick that Sawyer said that Weeks, who

was around two years old, had been riding on the back of a four-wheeler and had hit his face on poison ivy.

In June 2012, Calhoun told Sawyer that she wanted to end the relationship. In response, Sawyer cut Calhoun with a knife, dropped an item on her foot, and took her cell phone. With her arm bleeding, Calhoun ran outside screaming, prompting her neighbors to call 911. After this incident, Calhoun and Sawyer broke up, but reunited about a month later.

A short time later, during an argument between Calhoun and Sawyer about Sawyer's mother, Sawyer took Calhoun's cell phone and wallet, began strangling and punching her, and started to break items in their shared apartment. Sawyer also pushed Weeks and punched a hole in the wall, with his fist passing close to Calhoun's face. The dispute then moved downstairs, and Sawyer began strangling Calhoun again in front of Weeks. Calhoun began to lose consciousness and could not resist anymore, and asked Sawyer to let her go. Once Sawyer let her go, Calhoun ran to a neighbor's house and called the police.

Two of the apartment complex's maintenance workers came to Calhoun and Sawyer's apartment immediately following this incident. They observed a great deal of damage to the apartment, including damaged doors, broken glass, and holes in the wall, and that the apartment was in disarray. Sawyer was asked to leave by the employees. Sawyer and Calhoun broke up again after this incident, and Calhoun was later evicted from that apartment complex. Calhoun then moved to a different apartment, and she and Sawyer reunited again.

Around two weeks before Weeks' death, Calhoun noticed suspicious bruises on Weeks, including a bruise on his head. When she asked Sawyer what happened, Sawyer said that he accidentally closed a door on Weeks' head. Fitzpatrick testified that she asked Calhoun about this mark, and Calhoun told her that Sawyer said that Weeks had walked into a door. Fitzpatrick told Calhoun that it did not look like Weeks had walked into a door. A few days later, Fitzpatrick noticed bruises on Weeks' inner thigh and mentioned it to Calhoun. When Calhoun confronted Sawyer, Sawyer said that

Weeks got bruised while he was playing with him upside down, and that he did not mean to bruise Weeks. Calhoun told Sawyer to be careful and that he was playing too roughly with Weeks.

On November 23, 2012, Calhoun and Sawyer argued about Calhoun going to Chicago so that Weeks could see his biological father, who had recently reentered Weeks' life. Sawyer did not want Calhoun to go to Chicago, but Calhoun told Sawyer that he could not stop Weeks from seeing his father.

The next morning, Calhoun made Weeks a bowl of cereal before bringing him to the park outside of their apartment. According to Calhoun, Weeks did not appear to be sick or hurt that morning. While Calhoun and Weeks were at the park, Calhoun called Fitzpatrick and asked her to come pick Calhoun up later that afternoon. Around noon, after Calhoun and Weeks returned from the park, Calhoun took two pictures of herself with Weeks. Calhoun testified that Weeks had not injured himself at the park when they were together and had no injuries on his face. Sawyer had gone to the store, and Calhoun was waiting for Fitzpatrick to pick her up

from the apartment. Between 1:20 and 1:30 p.m., Fitzpatrick and her boyfriend arrived to pick Calhoun up. As Fitzpatrick drove into the apartment complex, she saw Sawyer walking, and he raised his middle finger at her. Fitzpatrick waited in the car and did not go into the apartment. As Calhoun left, Weeks was crying, and Calhoun told him that she would be back and that she loved him. Calhoun asked Sawyer to come get Weeks so she could leave.

Fitzpatrick testified that Calhoun's demeanor was normal and that Calhoun did not seem upset after leaving Weeks with Sawyer. Calhoun and Fitzpatrick went to a restaurant, then to Calhoun's old apartment to check the mailbox, and then to Fitzpatrick's apartment. Between 3:50 and 4:00 p.m., about 30 minutes after they got to Fitzpatrick's apartment, Calhoun received a call from a hospital notifying her that Weeks was there. Fitzpatrick testified that after Calhoun answered the phone, Calhoun's face went gray and she said, "I have to get out of here." Fitzpatrick and her boyfriend drove Calhoun to the hospital.

Calhoun testified that when she arrived at the hospital, no one

would tell her what was going on, and nurses took her into a small room where Sawyer was sitting. When the doctor came in and told Calhoun that Weeks had come in unresponsive, Calhoun asked the doctor what he was saying, and he told her that Weeks had died. Calhoun asked Sawyer several times what was going on, but Sawyer did not look at or say anything to her, and just kept his head down and rocked back and forth. Calhoun initially looked as though she was going to faint, but then collected herself and tried to attack Sawyer, shouting that he killed her baby. Sawyer did not respond.

A social worker at the hospital testified that, because Weeks had been brought to the hospital in cardiac arrest and was not breathing, protocol required her to speak to the family of the patient and to try to find out as much information as possible about what happened. Sawyer had arrived at the hospital with Weeks and said that he was Weeks' father. The social worker took Sawyer to the family room and tried to figure out what happened. Sawyer was unclear about what happened, and he said that Weeks was running around and getting on his nerves. Weeks then "just stopped and fell

to the floor and went to sleep." Sawyer said that Weeks did this all the time, and that he was not very concerned about it when it happened. Sawyer was unable to identify about what time this happened. Sawyer said that after Weeks "fell out," he picked Weeks up, noticed that Weeks was breathing, and took Weeks into the bedroom, where they both lay down in the bed. Sawyer was not able to provide a time for this either. The social worker testified that she had never had a parent tell her that he or she had noticed their child breathing, and she found this comment to be awkward and unsolicited. Sawyer said that when he woke up beside Weeks in the bed, Weeks was not breathing. The social worker described Sawyer as being angry and irritated with her for asking a lot of questions, and she described Sawyer as not very forthcoming with his answers. Sawyer also refused to provide Calhoun's phone number, although the social worker eventually obtained it after contacting Sawyer's mother at his direction.

The lead detective on the case testified that he spoke with Calhoun at the hospital, and that Calhoun said that she left Weeks

with Sawyer, and that when she left her apartment, Weeks was perfectly fine and had no marks or bruises. Calhoun showed the detective one of the photos that she had taken of Weeks before she left, which showed nothing unusual about Weeks' appearance. Calhoun told the detective that she knew that Sawyer killed Weeks.

A neighbor testified that in the early afternoon on the day Weeks died, Sawyer came to her apartment crying and holding Weeks. Sawyer asked the neighbor's mother to call an ambulance, which she did. The neighbor testified that Sawyer never said that anything had happened to Weeks, that Weeks looked like an "old man" and had bags under his eyes, and that Weeks was not breathing. The neighbor's mother told Sawyer that Weeks was dead.

The paramedic that arrived on the scene observed Sawyer performing CPR on Weeks. Weeks was unresponsive and did not have a pulse. The paramedics continued CPR in the ambulance until arriving at the hospital. However, they never found a pulse, Weeks remained unresponsive in the ambulance, and Weeks' extremities were cool to the touch. Sawyer told the paramedic that Weeks was

playing like he always did and fell asleep on the floor. Sawyer then said that when he picked Weeks up and went to get a drink from the kitchen, he noticed that Weeks was not breathing and had vomit coming out of his mouth. Sawyer denied causing any trauma to Weeks and "denied [Weeks] having medical history."

A forensic death investigator for the DeKalb County medical examiner's office was called to the scene to investigate Weeks' injuries. The investigator testified that before going to the scene, he went to the hospital, where he had an opportunity to observe Calhoun. Calhoun showed the investigator one of the photos she had taken that morning of herself and Weeks. In the photo, the right side of Weeks' jaw appeared uninjured, but when the investigator examined Weeks on the hospital table, he clearly had an injury to the right side of his jaw. The investigator then went to the apartment, where he observed some vomit on the carpet between the living room and the kitchen, as well as on a T-shirt.

Sawyer met with a police officer in an interview room at the hospital. Sawyer told the officer that Weeks had been playing in the

living room. He said that he then laid Weeks down for a nap, and lay down in the bed with him. When Sawyer woke up, he noticed that Weeks was not breathing and was very still, so he took Weeks to the upstairs neighbors. The neighbors noticed that Weeks was cold. Sawyer then went back downstairs and called 911. The officer testified that when he spoke with Sawyer, Sawyer was nervous, but he was not crying. The officer also spoke with Calhoun, who told him that there was a mark on Weeks' face that was not there when she left the house. She also told the officer that Sawyer had closed a door on Weeks' head a week before this incident.

Later that same day, the lead detective interviewed Sawyer at police headquarters after giving Sawyer *Miranda* warnings.[2] Sawyer told the detective that Weeks was upset after Calhoun left the apartment, but eventually he calmed down and began to play. Sawyer said that he fed Weeks some cereal after Calhoun left. Sawyer told the detective that Weeks had gotten quiet after playing

---

[2] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

in the living room, and that he was a little alarmed that Weeks was no longer playing and that he could no longer hear Weeks. Sawyer said that he went into the living room and saw Weeks asleep on the floor, and that when he picked Weeks up, he saw a mark on his chin. Sawyer told the detective that he took Weeks into the bedroom and lay down with him.

Later in the interview with the detective, Sawyer said that when he woke up, he tried to wake Weeks up by grabbing and slapping his chin, which caused the mark. Still later in the interview, Sawyer told the detective that when he woke up, he saw that Weeks already had a mark on his chin, and then he attempted to wake Weeks. Sawyer initially told the detective that Weeks' chest injury was the result of Sawyer performing CPR on Weeks, but he later said that it was the result of him squeezing and shaking Weeks in an attempt to wake him up. Sawyer stated twice that Weeks was afraid of him. At one point during the interview, the detective told Sawyer that Calhoun had said that he had hit Weeks. Sawyer did not confirm or deny this, but denied killing Weeks.

At trial, prosecutors presented testimony from Dr. Jonathan Eisenstat and Dr. Michael Greenwald, two expert witnesses who examined Weeks. Dr. Eisenstat, the Chief Medical Examiner for the GBI, was admitted as an expert in autopsies and forensic pathology. Dr. Eisenstat, who performed the autopsy on Weeks, testified that the cause of Weeks' death was blunt impact injury to the torso, that Weeks' injuries were not survivable, and that it is not possible for a child with no medical history to be playing one day and then "fall out" without there having been some force to the torso. He testified that Weeks had at least 23 scars from prior injuries — more scars than he usually expects to see on a two-year-old child — as well as lacerations of the heart, liver, pancreas, vena cava, and right adrenal gland, and contusions to the thymus, liver, right side of the diaphragm, and left lung. These injuries resulted in bleeding into the space around Weeks' heart and in his stomach.

Dr. Eisenstat testified that Weeks also had bruising on the left side of his chest, but that any bruising that would have been the result of someone performing CPR typically would have been in the

center of Weeks' chest, and that the abrasion on the right side of Weeks' chin did not appear to have been caused by someone using his hand to wake Weeks up. He further testified that Weeks' injuries to his pancreas, liver and heart could have been caused by someone "stomping" on a child while the child was lying on his back.

Dr. Greenwald, an emergency room doctor at the hospital who examined Weeks on the date he died, was admitted as an expert in pediatric emergency medicine. He testified that when Weeks arrived at the hospital, his pupils were dilated, fixed, and did not respond to light; that his extremities were cold; that there was a bruise on the right side of his chin; and that he had no pulse. Weeks arrived in the examination room at 4:02 p.m., and Dr. Greenwald pronounced him dead at 4:16 p.m. Dr. Greenwald testified that, based on his experience, a considerable amount of force is needed to lacerate a two-and-a-half-year-old child's heart, and it is extremely unlikely that CPR done incorrectly would cause fractures of a rib, let alone injuries to the heart or the lungs.

Although Sawyer has not challenged the sufficiency of the

evidence, it is our customary practice to review the sufficiency of the evidence in murder cases, and we have done so here. After reviewing the record of Sawyer's trial, we conclude that the evidence presented against him was more than sufficient to authorize a rational jury to find beyond a reasonable doubt that Sawyer was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 318-319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted.)).

2. Sawyer contends that he received ineffective assistance of trial counsel because counsel (a) did not object to the lead detective's purported comments on Sawyer's credibility; (b) did not object to Calhoun's testimony that allegedly placed Sawyer's character into evidence; and (c) did not object to hearsay testimony involving statements that Calhoun made to Fitzpatrick and the detective.

"To prevail on a claim of ineffective assistance of counsel, a

defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant." *Swanson v. State*, 306 Ga. 153, 155 (2) (829 SE2d 312) (2019) (citing *Strickland v. Washington*, 466 U. S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984)). To satisfy the deficiency prong, a defendant must show that trial counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). "This requires a defendant to overcome the strong presumption that trial counsel's performance was adequate." (Citation and punctuation omitted.) *Swanson*, 306 Ga. at 155 (2). "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Citation and punctuation omitted.) *Stripling v. State*, 304 Ga. 131, 138 (3) (b) (816 SE2d 663) (2018). "[R]easonable decisions as to whether to raise a specific objection are ordinarily matters of

trial strategy and provide no ground for reversal[.]" (Citation and punctuation omitted.) *Morris v. State*, 303 Ga. 192, 201 (VI) (811 SE2d 321) (2018).

A defendant "must also show that the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious that they likely affected the outcome of the trial." (Citation and punctuation omitted.) *Brown v. State*, 307 Ga. 24, 33 (6) (834 SE2d 40) (2019). "Satisfaction of this test is a difficult endeavor. Simply because a defendant has shown that [his] trial counsel performed deficiently does not lead to an automatic conclusion that [he] was prejudiced by counsel's deficient performance." (Citation and punctuation omitted.) Id. "[T]he burden of proving a denial of effective assistance of counsel is a heavy one," *Brown v. State*, 302 Ga. 454, 457-458 (2) (807 SE2d 369) (2017) (citation and punctuation omitted), and because a defendant must satisfy both prongs, this Court does not need to "approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."

*Strickland*, 466 U. S. at 697 (IV); see also *Jones v. State*, 305 Ga. 750, 755 (4) (827 SE2d 879) (2019).

(a) Sawyer first argues that he received ineffective assistance of trial counsel because counsel did not object to the lead detective's purported comments on Sawyer's credibility. We disagree.

On direct examination, the detective testified that Sawyer's explanation as to how Weeks got the injuries to his chin and to his chest were "inconsistent." As a preliminary matter, Sawyer argues that under OCGA § 24-6-620, the detective could not comment on the credibility of Sawyer's statement. See OCGA § 24-6-620 ("The credibility of a *witness* shall be a matter to be determined by the trier of fact, and if the case is being heard by a jury, the court shall give the jury proper instructions as to the credibility of a *witness*." (emphasis supplied)). Our cases interpreting former OCGA § 24-9-80, OCGA § 24-6-620's predecessor statute,[3] indicate that the former

---

[3] OCGA § 24-6-620's predecessor statute, OCGA § 24-9-80, was carried forward to the current Evidence Code with only minor revisions, and because there is no materially identical Federal Rule of Evidence on this matter, our precedent interpreting OCGA § 24-9-80 still applies in interpreting OCGA § 24-6-620. See *Grant v. State*, 305 Ga. 170, 177 n.4 (824 SE2d 255) (2019).

statute applied to defendants who testified on their own behalf at trial and so became witnesses. See *McIlwain v. State*, 264 Ga. 382, 383 (3) (445 SE2d 261) (1994) ("The credibility of a defendant *who testifies in his own behalf* is for the jury, which may consider his demeanor and conduct on the witness stand." (emphasis supplied)) (citing *Brantley v. State*, 190 Ga. App. 642, 643-644 (2) (379 SE2d 627) (1989)); *Brantley*, 190 Ga. App. at 643-644 (2) ("The credibility of all witnesses, including the defendant *who testifies in his own behalf*, is for the jury under proper instructions from [the] court. OCGA §§ 24-9-80; 24-9-20 (a)." (emphasis supplied)); *Walker v. State*, 132 Ga. App. 274, 278 (5) (208 SE2d 5) (1974) ("When the accused does so testify he at once becomes the same as any other witness, and his credibility is to be tested by and subjected to the same tests as are legally applied to any other witness; and in determining the degree of credibility that shall be accorded to his testimony the jury have a right to take into consideration the fact that he is interested in the result of the prosecution, as well as his demeanor and conduct upon the witness stand." (citation and

punctuation omitted)).

Sawyer has cited no authority for the proposition that OCGA § 24-6-620 applies where a defendant does not testify at trial and is therefore not a witness, and we have found nothing to support that argument. See *Marshall v. State*, 276 Ga. 854, 856 (2) (c) (583 SE2d 884) (2003) (applying former OCGA § 24-9-80 to detective's testimony as to whether co-defendant's statement was inconsistent with evidence, though no mention of whether co-defendant testified at trial); *Griffin v. State*, 267 Ga. 586, 587 (2) (481 SE2d 223) (1997) (applying former OCGA § 24-9-80 to detective's testimony that defendant was not telling the truth, though no mention of whether defendant testified at trial). See also *Frei v. State*, 252 Ga. App. 535, 538 (4) (557 SE2d 49) (2001) (applying former OCGA § 24-9-80 to defense counsel's question to defendant's wife about "whether she would believe her husband if he were to testify under oath," though the opinion does not specify whether defendant testified at trial). Therefore, trial counsel's failure to raise a novel legal argument does not constitute ineffective assistance of counsel. See *Jordan v. State*,

307 Ga. 450, 456 (3) (836 SE2d 86) (2019); see also *Hughes v. State*, 266 Ga. App. 652, 655 (3) (a) (598 SE2d 43) (2004) ("[T]he standard for effectiveness of counsel does not require a lawyer to anticipate changes in the law or pursue novel theories of defense." (citation and punctuation omitted)).

Moreover, even if Sawyer were a witness, the detective's comments did not directly address Sawyer's credibility and were not improper. See *Davis v. State*, 306 Ga. 140, 147 (3) (f) (829 SE2d 321) (2019) (no deficient performance where trial counsel failed to object to detective's testimony that a witness's account of the crime was consistent with his investigation, because such testimony "did not speak directly to [the witness's] truthfulness." (citation and punctuation omitted)); see also *Harris v. State*, 304 Ga. 652, 657 (2) (c) (821 SE2d 346) (2018) ("Viewed in context, [the detective's] testimony was not a direct comment on [the witness's] veracity."). Any objection would therefore be meritless, and "[t]he failure to make a meritless objection is not deficient performance." *Walker v. State*, 306 Ga. 637, 645 (2) (b) (832 SE2d 783) (2019). Because

Sawyer has not shown that his counsel performed deficiently by failing to raise this objection, this claim of ineffective assistance fails.

(b) Second, Sawyer argues that he received ineffective assistance from trial counsel because counsel did not object to testimony that allegedly placed Sawyer's character into evidence. On cross-examination, Sawyer's trial counsel asked Calhoun, "But you didn't know what the cause of death was, did you?" Calhoun replied, "The doctor told me he came in unresponsive and he didn't make it, and I knew what [Sawyer] was capable of. He used to hurt me all the time." We disagree that counsel performed deficiently by failing to object to this statement.

In general,

"[e]vidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion[.]" OCGA § 24-4-404 (a). Likewise, absent an exception, "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith . . . ." OCGA § 24-4-404 (b).

*Wade v. State*, 304 Ga. 5, 10 (3) (815 SE2d 875) (2018). However,

pretermitting whether Calhoun's testimony was improper character evidence that should have been excluded under Rule 404 (a), Calhoun's statement was harmless because it was cumulative of a significant volume of evidence already presented to the jury without objection regarding the long history of violence between Sawyer and Calhoun, and "[t]rial counsel was not deficient in failing to object to the cumulative testimony of [the witness]" on this matter. *Koonce v. State*, 305 Ga. 671, 676 (2) (d) (827 SE2d 633) (2019). This claim of ineffective assistance therefore fails.

(c) Finally, Sawyer argues that he received ineffective assistance from trial counsel because counsel did not object to hearsay testimony involving statements that (1) Calhoun made to Fitzpatrick and (2) Calhoun made to the lead detective. We disagree.

An out-of-court statement made by a witness is not hearsay if the witness "testifies at the time of trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a prior consistent statement under Code Section 24-6-613[.]" OCGA § 24-8-801 (d) (1) (A). In relevant part, OCGA § 24-6-

613 (c) states:

> A prior consistent statement shall be admissible to rehabilitate a witness if the prior consistent statement logically rebuts an attack made on the witness's credibility. A general attack on a witness's credibility with evidence offered under Code Section 24-6-608 [evidence of character and conduct of witness] or 24-6-609 [impeachment by evidence of conviction of a crime] shall not permit rehabilitation under this subsection. If a prior consistent statement is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive, the prior consistent statement shall have been made before the alleged recent fabrication or improper influence or motive arose.

First, Calhoun's statements to Fitzpatrick were admissible as prior consistent statements. During cross-examination of Calhoun, Sawyer's trial counsel clearly implied that Calhoun fabricated the story of her argument with Sawyer the night before Weeks' death. Trial counsel questioned Calhoun about her phone call with Weeks' father and Sawyer's reaction to the phone call, asking whether Calhoun "[was] lying then or . . . lying now" about her argument with Sawyer the evening before Weeks' death. Later, during Fitzpatrick's testimony, the State asked Fitzpatrick about her conversations with

Calhoun on the morning of Weeks' death.[4] Fitzpatrick's testimony that Calhoun told her about the fight with Sawyer before Weeks' death rebutted the attack made by trial counsel on Calhoun's credibility, and Fitzpatrick's statements were therefore "prior consistent statements, not hearsay, and were admissible to rehabilitate, rather than improperly bolster, [Calhoun's] credibility." *Brown*, 302 Ga. at 459 (2) (a).

Second, trial counsel's decision not to object to Calhoun's statements to the detective about Weeks' lack of injuries in her photograph was reasonable. Throughout his cross-examination of Calhoun, trial counsel continued to attack Calhoun's credibility, asserting that Calhoun "told the detective [that Sawyer] had never done anything to [Weeks]. In fact, [Sawyer] treated [Weeks] like [Weeks] was his own son." Trial counsel also questioned Calhoun about her claim that Weeks did not have any injuries to his face prior

---

[4] In response to the State's question whether Calhoun had "ever [told] you about an argument that she and [Sawyer] had gotten into the night before?" Fitzpatrick testified that Calhoun "thought that the child's father was getting in contact with them, that [Sawyer] was angry about that."

to his death, asking whether Weeks received a bruise on his face on November 22, two days prior to Weeks' death.

At the hearing on the motion for a new trial, Sawyer's trial counsel testified that it was a strategic decision to not object when the lead detective testified that Calhoun claimed that Weeks had no injuries to his face the morning of his death[5] because he wanted to "use[ ] that testimony to show once again that Danielle Calhoun had lied about there not being any injuries on [Weeks]," and that the detective's "testimony was, in fact, helpful . . . because the mother of

---

Q: While at the hospital on November 24th, did you speak with Ms. Danielle Calhoun?
A: Yes, ma'am, I did.
Q: What was her demeanor when you spoke with her?
A: She was upset.
Q: What did she tell you?
A: Ms. Calhoun told me that she had left her two-year-old son, Michael Weeks, with her boyfriend, Devin Sawyer. She stated that when she left her residence and left the child with Mr. Sawyer, [Weeks] was perfectly fine, he had no marks or bruises on his person. She also said she took a photograph of the child victim before she left.
Q: Did Ms. Danielle Calhoun show you the photograph that she took before she left?
A: Yes, she did. She showed me a photo that she had in her cell phone. She also made a statement that she knows that Devin Sawyer killed her baby.

the child said that there were no injuries when the photograph clearly shows that there was a scratch mark on the child's face from one point to another." Although later testimony may have undermined the effectiveness of trial counsel's argument about what the photograph clearly showed,[6] "hindsight has no place in an assessment of the performance of trial counsel." (Citation and punctuation omitted.) *Hills v. State*, 306 Ga. 800, 807 (3) (a) (833 SE2d 515) (2019). Trial counsel's decision not to object to the detective's testimony was not an unreasonable strategy in light of trial counsel's overarching defense strategy to discredit Calhoun. In light of trial counsel's testimony, "trial counsel's decision to use [the detective's] testimony in support of a defense strategy — and not to object to it on hearsay grounds — was not so patently unreasonable

---

[6] During trial counsel's cross-examination of Dr. Eisenstat, which occurred after the detective's testimony, Dr. Eisenstat was asked about State's Exhibit 41, an autopsy photo of Weeks' face, in which a light scar is visible on Weeks' right cheek. Trial counsel asked Dr. Eisenstat whether that scar would be visible in a photograph taken of Weeks on the same morning. Dr. Eisenstat agreed that it would be visible if that part of Weeks' face was in the photograph. When shown the photo taken of Weeks and Calhoun on the morning of Weeks' death, Dr. Eisenstat stated that the photo was "grainy" and that he did "see a line that's pale on the side, but [he had] to be honest, [he] can't tell [trial counsel] if that is a scar or not."

that no competent attorney would have chosen to forgo an objection to this testimony." (Citation and punctuation omitted.) *Chavers v. State*, 304 Ga. 887, 895 (4) (823 SE2d 283) (2019).

Third, as for the detective's testimony regarding Calhoun's statements "that she knows that Devin Sawyer killed her baby," at the hearing on the motion for new trial, trial counsel was not asked about whether he considered objecting to this piece of the detective's testimony. In any event, this testimony was cumulative of properly admitted evidence already presented to the jury regarding Calhoun accusing Sawyer of killing Weeks, as both the paramedic and the social worker had already testified to Calhoun accusing Sawyer of killing Weeks when she found out Weeks was deceased, and Sawyer's subsequent reaction to Calhoun's accusation. Accordingly, "[t]rial counsel was not deficient in failing to object to the cumulative testimony of [the witness]" on this matter. *Koonce*, 305 Ga. at 676 (2) (d).  This claim of ineffective assistance therefore fails.

*Judgment affirmed.  All the Justices concur.*

DECIDED FEBRUARY 28, 2020 -- RECONSIDERATION DISMISSED MARCH 25, 2020.

Murder. DeKalb Superior Court. Before Judge Seeliger.

*Daniel H. Petrey*, for appellant.

*Sherry Boston, District Attorney, Emily K. Richardson, Elizabeth H. Brock, Destiny H. Bryant, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.