**FIRST DIVISION
BARNES, P. J.,
GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**February 22, 2021**

# In the Court of Appeals of Georgia

A20A1870. INTEMANN v. THE STATE.

BARNES, Presiding Judge.

A Cobb County jury found Christopher Jordan Intemann guilty of three counts of armed robbery and three counts of aggravated assault, and the trial court denied his motion for new trial. On appeal, Intemann raises several claims of error. First, Intemann argues that the trial court erred in admitting posts from a Twitter account that he maintains were attributed to him without proper authentication. Second, Intemann contends that the trial court erred in allowing a detective to testify about the manner in which internet protocol ("IP") addresses work without requiring the State to properly qualify him as an expert. Third, Intemann asserts that his trial counsel rendered ineffective assistance by failing to object when the State introduced evidence of his invocation of his right to counsel during his police interview; by

failing to object to jury instructions on the law of conspiracy and party to a crime; and by failing to object on hearsay grounds to testimony from a detective about research into a phone number associated with an online advertisement. For the reasons discussed below, we conclude that Intemann has failed to show reversible error by the trial court or that his trial counsel was ineffective. We therefore affirm.

*The Robberies.* Viewed in the light most favorable to the verdict,[1] the evidence showed that the armed robberies in this case occurred after victims responded to advertisements for the sale of electronics posted online on Craigslist and then were lured to the same neighborhood to complete the purported sales.

On October 29, 2015, a husband who wanted to buy an iPhone 6 for his wife found one for sale on Craigslist. He sent a text message to the cell phone contact number listed in the Craigslist advertisement, and the seller responded. After the parties agreed to a sales price for the iPhone, the seller told the husband to meet him at 3638 Thurleston Court, an address in a residential neighborhood in Cobb County. However, when the husband drove to the address that afternoon, the seller was not there, and the house at that location was empty. The husband called the seller using the same contact number, and the seller told the husband to wait for him to arrive.

---

[1] See *Lanham v. State*, 345 Ga. App. 657, 657 (813 SE2d 184) (2018).

A few minutes after the phone conversation, a man carrying a bag approached the husband's car and got into the backseat without asking first. The man showed the husband an iPhone and asked if he brought the cash for the purchase. The husband answered in the affirmative and started to get the money out of his wallet, whereupon the man pulled out a gun, unlocked the safety, pointed the gun at the husband, and demanded that he put the cash and his own cell phone into the bag. After taking approximately $500 in cash and the cell phone from the husband, the man exited the car. He fled on foot, heading north on Thurleston Court and then right on Asquith Avenue. Once the man ran off, the husband drove away and waved down another driver, who allowed him to borrow her cell phone and call 911.

A similar incident occurred less than a month later, on November 22, 2015, and involved a couple who wanted to purchase a MacBook laptop computer. After the boyfriend found a MacBook for sale on Craigslist, he communicated with the seller by email and text message based on the contact information in the advertisement. The cell phone number listed for the seller in the MacBook advertisement was the same number listed in the iPhone advertisement associated with the October 29 robbery. After communicating with the seller, the boyfriend discussed the potential purchase with his girlfriend, who agreed to provide the cash to buy the MacBook.

Once the parties agreed on a sales price for the MacBook, the seller spoke with the boyfriend on the phone and instructed him to meet the seller in the parking lot of a Walgreens in Cobb County that afternoon. The girlfriend brought the cash and drove her boyfriend to the parking lot, but the seller was not there. The boyfriend informed the seller that they were at the Walgreens. After fifteen minutes passed and the seller had not arrived, the boyfriend contacted the seller, who said that he was waiting to get a ride to the Walgreens. Thirty more minutes passed, but the seller did not arrive. The boyfriend again called the seller, who advised the couple to meet him at 3626 Thurleston Court, which was a mile or two from the Walgreens. The couple drove to that address, but the seller was not there, and the house was empty.

As they were about to drive away from the neighborhood, a man walked toward the couple's car with an Apple store bag that contained a box inside of it and waved for them to stop. The boyfriend got out of the car and approached the man, who wanted to go to a different location to complete the sale. While they were talking, the man got into the backseat of the couple's car even though the boyfriend told him not to do so. When the man refused to get out of the backseat, the boyfriend got into the front passenger seat, and the man instructed the girlfriend, who was still in the driver's seat, to drive to a house located on the corner of Asquith Avenue and another

4

street in the same neighborhood. Once they arrived at that location, the man pulled out a gun, pointed it at the couple, and demanded the cash and their cell phones. In response to the man's demand, the boyfriend opened the glove compartment, retrieved $1,100 in cash, and gave it to the man. The girlfriend also gave the man her and her boyfriend's cell phones. After taking the cash and cell phones, the man exited the car and ran behind a house located at 2180 Asquith Avenue. Once the man fled, the couple drove from the scene and flagged down a police officer at a nearby traffic stop.

*The Investigation.* The three robbery victims provided descriptions of the robber, but the police were unable to apprehend a suspect on the dates of the robberies. The husband in the October 29 robbery and the boyfriend in the November 22 robbery, both of whom spoke on the phone with the seller, thought that the seller's voice sounded different from the robber's voice.

The husband in the October 29 robbery also provided the police with a copy of the Craigslist advertisement for the iPhone and the seller's cell phone number that he had called. The lead detective assigned to the case had a crime analyst run the seller's phone number through a computer database. Based on the report from the crime analyst, the detective was able to connect the phone number to 2176 Asquith

5

Avenue, which was Intemann's home address. The address was near where the robberies occurred and where the robber was seen fleeing after the robberies.

In addition to researching the phone number of the iPhone seller, the detective subpoenaed Craigslist for information about the account holder who placed the iPhone advertisement, and Craigslist identified Christopher.Intemann@yahoo.com as the email address associated with the advertisement. Craigslist also provided the IP address for the iPhone advertisement, and, based on a subpoena issued to AT&T, the detective learned that the IP address was registered to Intemann's home address. Another detective sent a second subpoena to Craigslist, which identified several more advertisements posted from the same user account, including the advertisement for the MacBook associated with November 22 robbery.

As part of the investigation, the detectives showed photographic lineups separately to each of the robbery victims that included a photograph of Intemann. The husband in the October 29 robbery and boyfriend in the November 22 robbery were unable to identify anyone in the lineup. When a detective showed the lineup to the girlfriend, she selected two photographs as the robber in the November 22 robbery. According to the girlfriend, the two men that she selected were so similar in

6

appearance that she thought they were the same person. One of the men that the girlfriend selected was Intemann.[2]

After Intemann was identified as a suspect, the lead detective obtained a search warrant for Intemann's house. During the search, the police found several items in Intemann's bedroom, including a MacBook, a MacBook box, a Hi-Point nine millimeter handgun, ammunition, and $405 in cash.

*Intemann's Police Interviews.* After the search warrant was executed, Intemann was transported to the Cobb County Police Department, where he agreed to be interviewed by the lead detective after being advised of his *Miranda*[3] rights.

At the beginning of the interview, Intemann explained that he lived at the Asquith Avenue address with his mother and several other family members, but his descriptions of the other males in the household did not meet the description of the robber given by the victims. However, the detective observed that Intemann had short dreadlocks, and the boyfriend in the November 22 robbery described the robber as having that particular hairstyle.

---

[2] The other person identified in the photographic lineup by the girlfriend was a random individual whom the detective believed looked similar to Intemann.

[3] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

As the interview continued, Intemann admitted that the handgun found in his bedroom belonged to him and that he had placed the Craigslist advertisements for the iPhone and MacBook. He also admitted that the phone number listed in the Craigslist advertisements and used for communication with the victims was his cell phone number.

Intemann initially maintained that he had no knowledge of the robberies and that he had sold his phone to some other men before the robberies had taken place. But Intemann later claimed that another individual named Jacoby was at Intemann's home on the dates that the robberies occurred, had learned of Intemann's efforts to sell the iPhone and MacBook to the victims, and had posed as the seller and robbed them.[4] As to the November 22 robbery, Intemann admitted that he spoke with the boyfriend on that date and directed him to the Walgreens, but he claimed that Jacoby answered his phone the next time that the boyfriend called and then left the house to commit the robbery. Intemann asserted that he remained home during the robberies and did not participate.

---

[4] At other times during his interview, Intemann claimed that another individual named Jarrod was involved in the robberies.

At one point in the interview, Intemann told the detective that he did not want to speak with him anymore and that he wanted an attorney. The detective stopped the interview and informed Intemann that he was under arrest for the robberies. However, a few minutes later, when the detective returned to tell Intemann that his paperwork was being completed and that he would not have to wait much longer in the interview room, Intemann said that he wanted to continue talking with the detective about the robberies and asked to be read his *Miranda* rights again. The detective advised Intemann of his *Miranda* rights for a second time, after which Intemann signed a waiver form and completed his interview with the detective.

Six days later, Intemann and his mother contacted the lead detective and asked for another interview. Intemann was advised again of his *Miranda* rights, and he signed a new waiver form and agreed to speak with the detective at the county jail where he was housed. Once the new interview began, Intemann admitted that he had lied during his previous interview. Rather than Jacoby being the robber, Intemann claimed that his friend Contee interrupted the sale of the iPhone and robbed the husband, and that his friend Courtney interrupted the sale of the MacBook and robbed the couple. Intemann also said that he believed that Contee used the handgun found

in Intemann's bedroom to commit the first robbery. Intemann had not mentioned Contee or Courtney during his first interview.

*The Twitter Account.* After Intemann's second interview, the detective located Contee and interviewed him. During the interview, Contee denied any involvement in the October 29 robbery and also told the detective that Intemann had a Twitter account.[5] Based on the information provided by Contee, the detective printed out posts from the Twitter account that featured a profile photo of Intemann under the Twitter username or handle "@ohitsgist" and the Twitter display name "lil jesus piece."[6] A Tweet from the account on October 30, 2015 read, "me n my n****s get this money," a Tweet on November 24, 2015 read, "Been gettin money be4 these n****s," and a Tweet on November 27, 2015 referred to a "6 plus I'm sellin," an

---

[5] Twitter is a self-described "information network made up of short messages (including photos, videos, and links) from all over the world." Twitter, Glossary, https://help.twitter.com/en/glossary (last visited Jan. 22, 2021) (hereinafter, Glossary). Posts on Twitter are referred to as "Tweets." See id.

[6] A Twitter username or handle "is used to identify a particular user on Twitter and is formed by placing the @ symbol next to a username." *Roca Labs v. Consumer Opinion Corp.*, 140 F. Supp3d 1311, 1319, n. 4 (M. D. Fla. 2015). See Glossary, supra n. 5. A Twitter display or account name "is a personal identifier . . . displayed in your profile page and used to identify you to friends, especially if your username is something other than your name or business name." See Glossary, supra n. 5. A profile photo is "the picture that appears next to each of your Tweets." See id.

apparent reference to an iPhone 6. A Tweet on November 29 read, "Ain't hit a lick in so long," and "hit a lick" was street slang for committing a robbery, according to the detective.

*Procedural History.* Intemann was indicted on three counts of armed robbery and three counts of aggravated assault based on the October 29 and November 22 incidents. The trial court held a *Jackson-Denno* hearing[7] and determined that Intemann's statements to the detective were admissible, including the statements made by Intemann after he reinitiated communication with the detective following his invocation of his right to counsel. The trial court also conducted a hearing on a motion in limine filed by Intemann to exclude the Tweets attributed to him, and, after hearing the pretrial testimony of Contee, the court determined that the Tweets discussed above were admissible.[8]

At trial, the three victims and the detectives assigned to the case testified to events as previously summarized.[9] The State also introduced into evidence, over

---

[7] See *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[8] The trial court granted Intemann's motion in limine as to certain other Tweets that are not at issue in this appeal.

[9] The husband who was the victim of the October 29 robbery had some proficiency in English, but his native language was Mandarin. He testified through

11

Intemann's objection, the aforementioned Tweets after linking Intemann to the Twitter Account through the testimony of Contee and the lead detective.

In addition to testifying about Intemann's Twitter account, Contee testified that he was at Intemann's house on October 29 but denied having any involvement in the armed robbery committed that day. Contee testified that on that date, Intemann left the house for 15 to 30 minutes and then asked Contee how to get rid of a cell phone when he returned. According to Contee, he told Intemann that the phone could be smashed with a hammer or flushed down the toilet, after which Contee heard pounding noises and flushing in the bathroom. Contee further testified that Intemann owned a handgun that he purchased in August or September 2015.

Intemann elected not to testify, but he called his mother as a witness. She testified, among other things, that after Intemann was arrested, she received a text message from someone whom she believed was named Courtney who was friends with Intemann. In the text message, Courtney asked her to call him. According to the mother, she then called Courtney, who asked her if Intemann had "said anything" or "mentioned any names."

---

an interpreter at trial.

Following the close of evidence, the jury found Intemann guilty of the charged offenses. The trial court merged the aggravated assault counts into the armed robbery counts for purposes of sentencing and entered judgment on the conviction and sentence. Intemann filed a motion for new trial, as amended, in which he argued that his trial counsel was ineffective on several grounds. After a hearing was held in which Intemann's trial counsel testified, the trial court denied the motion, resulting in this appeal.

1. Intemann contends that the trial court erred in admitting the printouts of the Tweets that the State maintained that he posted from his Twitter account because the Tweets were not properly authenticated. We disagree.

Under Georgia's Evidence Code,

> authentication of evidence may be achieved through any of a variety of means [so long as there is] evidence sufficient to support a finding that the matter in question is what its proponent claims. Documents from electronic sources are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence, which may include the appearance, contents, substance, internal patterns, or other distinctive characteristics of the documents, taken in conjunction with circumstances.

13

(Citations and punctuation omitted.) *Nicholson v. State*, 307 Ga. 466, 475 (5) (837 SE2d 362) (2019). See OCGA § 24-9-901 (a), (b) (4).[10] Authentication also can be achieved through the "[t]estimony of a witness with knowledge that a matter is what it is claimed to be." OCGA § 24-9-901 (b) (1). "Once the party seeking to authenticate evidence presents a prima facie case that the evidence is what it purports to be, the evidence is properly admitted, leaving the ultimate question of authenticity to be decided by the jury." *Nicholson*, 307 Ga. at 475 (5). A trial court's decision to admit or exclude evidence is reviewed for a clear abuse of discretion. *Redding v. State*, 354 Ga. App. 525, 534 (3) (841 SE2d 192) (2020).

Prior to the admission of the Tweets, Contee testified that he had been friends with Intemann since middle school, had known him for about ten years, and would often spend the night at his house. Contee testified that during the time period of the

---

[10] OCGA § 24-9-901 (a) and (b) (4) provide:

(a) The requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Code section:

. . . .

(4) Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances[.]

14

robberies, Intemann had a Twitter account, and he and Intemann followed each other's accounts. According to Contee, Intemann posted under "ohitsgist" and "liljesuspiece" on Twitter. Contee explained that Intemann was an aspiring rap artist who performed under the moniker "Gist" and that his Twitter username was intended to be read as "oh its gist." Additionally, Contee testified that Intemann's Twitter account had a profile photo of Intemann on it that had been taken by Contee, and he identified the profile photo that appeared on the account.

The lead detective testified that Contee provided him with the name of Intemann's Twitter account, after which he searched for and located the account, observed that it had Intemann's profile photo on it, and printed out Tweets from that account. The detective identified the pages marked as State's Exhibit 68 as the Tweets that he printed out from the Twitter account that he believed belonged to Contee based on his research. The Tweets listed the Twitter username or handle as "@ohitsgist" and the Twitter display name as "liljesuspiece."

Based on the testimony of Contee and the lead detective, the trial court was authorized to find that the State established a prima facie case that the printouts accurately reflected the contents of the Tweets and that Intemann posted them. See *Blackledge v. State*, 299 Ga. 385, 391 (4) (788 SE2d 353) (2016) (holding that

15

printouts of posts from users' MySpace pages were properly authenticated where officer testified that he used known identifying information about the users to locate their pages, that the printouts were an accurate representation of what was posted on those pages, and that the photographs posted on the pages depicted the users); *Cotton v. State*, 297 Ga. 257, 259-260 (3) (773 SE2d 242) (2015) (holding that messages from Facebook account were properly authenticated by witness who knew the defendant's nickname found on the account, recognized that the defendant's friends and family were listed as "friends" on the account, and engaged in conversations with the defendant on the account); *Burgess v. State*, 292 Ga. 821, 823-824 (4) (742 SE2d 464) (2013) (holding that MySpace profile page was sufficiently authenticated where the page belonged to a person who went by the defendant's nickname, contained images of the defendant, and accurately listed the defendant's age and hometown, and where the officer who printed the page testified that it fairly and accurately represented what he had observed on his computer screen);[11] *In the Interest of L. P.*, 324 Ga. App. 78, 82 (2) (749 SE2d 389) (2013) (holding that printouts from Facebook page were sufficiently authenticated where the page belonged to a person

[11] See *Cotton*, 297 Ga. at 259 (3), n. 6 (citing *Burgess* although it was decided under old Evidence Code and noting that the same rules for authentication of social media posts apply under the current Evidence Code).

16

using the defendant's nickname, contained pictures of the defendant, and listed a day and month of birth for the account holder that matched the defendant's birth date, and where the officer who printed the page testified that it fairly and accurately represented what he had observed on his computer screen). To the extent that Intemann claims that someone else could have hacked into his Twitter account and posted the Tweets, "this argument goes to weight, not authenticity." *Holzheuser v. State*, 351 Ga. App. 286, 290 (1) (a) (i) (828 SE2d 664) (2019). Accordingly, the trial court did not abuse its discretion by admitting the printouts of the Tweets into evidence at trial.

2. Intemann argues that the trial court erred in allowing the lead detective to testify regarding how IP addresses work without requiring the State to properly qualify him as an expert. We discern no reversible error.

At trial, the prosecutor initially asked the lead detective about IP addresses without any objection from Intemann:

> Q: And what is an IP address?
> A: An IP address is just a – basically what internet sources come out of your home or a wifi connection, wherever you're using the internet at.
> Q: For a particular location and device?
> A: Correct.

The detective further testified without objection that Craigslist provided him with the IP address for the iPhone advertisement posted on October 29, 2015 and that he then subpoenaed records from AT&T that showed that the IP address was linked to Intemann's home address.

When the prosecutor subsequently asked the detective about how IP addresses work, Intemann objected for the first time, asserting that "there's been no foundation that this witness has the qualifications to answer how this particular technology works." Seeking to establish a foundation for the testimony, the prosecutor then asked the detective if he was familiar with computers, if he was familiar with the internet, and if he used the internet for work and at home, and the detective answered those questions in the affirmative. At that point, Intemann renewed his objection, contending that knowledge regarding how IP addresses work was beyond the ken of the average juror and required specialized expert knowledge beyond being a general internet user. The trial court overruled the objection. The prosecutor subsequently modified his question and the detective testified, "wherever you're at, it's going to be the same IP. Your home has an IP address. Your work is associated with an IP address, all listed under that account of the Internet."

18

Pretermitting whether the trial court erred in ruling that the State had laid a sufficient foundation for the detective's testimony regarding how IP addresses work, we conclude that any such error was harmless. "It is fundamental that harm as well as error must be shown for reversal," and "[t]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citations and punctuation omitted.) *Palmer v. State*, __ Ga. __ (3) (No. S20A1118, decided Jan. 11, 2021). Moreover, "[i]n determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." (Citation and punctuation omitted.) Id.

Here, the record reflects that Intemann did not object until after the detective had already answered multiple questions pertaining to IP addresses, and that the detective's testimony after Intemann urged his objection was largely cumulative of his earlier testimony. Furthermore, the detective's testimony regarding IP addresses was intended to show that Intemann posted the Craigslist advertisements, but Intemann himself admitted during his police interviews that he posted them. We therefore conclude that it is highly probable that the detective's testimony to which Intemann objected did not contribute to the verdict. See *Hinkson v. State*, __ Ga. __

19

(6) (850 SE2d 41) (2020) (concluding that any error in admission of detective's testimony that gun was found in the defendant's apartment was harmless, where, among other things, the testimony was cumulative of defendant's own statement that he was holding a gun when his girlfriend arrived at his apartment); *Coleman v. State*, 257 Ga. 313, 313 (2) (357 SE2d 566) (1987) (concluding that any error in admission of detective's testimony was harmless, where "[t]he transcript shows that the defendant did not object on the ground urged on appeal until late in [the detective's] testimony, and that many of the conclusions [the detective] offered after the objection was overruled were merely cumulative of his earlier testimony"). See also *Cook v. State*, 274 Ga. 891, 896 (4) (561 SE2d 407) (2002) ("[A]ny error in admitting the statements at issue must be deemed harmless because the statements were echoed by other independent evidence at trial.").

3. Intemann maintains that his trial counsel rendered ineffective assistance in several respects. We are unpersuaded.

To establish a claim of ineffective assistance of counsel under the test enunciated in *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984), Intemann

20

must prove both that the performance of his lawyer was deficient and that he was prejudiced by this deficient performance. To prove that the performance of his lawyer was deficient, [Intemann] must show that the lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. And to prove that he was prejudiced by the performance of his lawyer, [Intemann] must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

(Citations and punctuation omitted.) *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). "This Court need not address both components of the inquiry if the defendant makes an insufficient showing on one." (Citation and punctuation omitted.) *Stepp-McCommons v. State*, 309 Ga. 400, 407 (4) (845 SE2d 643) (2020).

(a) Intemann argues that his trial counsel was ineffective by failing to object when the State elicited testimony from the lead detective that Intemann invoked his right to counsel during his first police interview.[12] According to Intemann, evidence

---

[12] At trial, the State introduced evidence of Intemann's first and second police interviews through the testimony of the lead detective. Intemann's police interviews were recorded, but the State chose to introduce the substance of the interviews through the detective's testimony rather than the recordings, given that the recordings "would need extensive redactions because they talk about other criminal activity" and sentencing.

21

of his invocation of his right to counsel constituted an impermissible comment on his right to remain silent, and his trial counsel was deficient in failing to object. We disagree because any objection to the detective's testimony would have been futile.

In the present case, the testimony elicited from the detective merely showed that Intemann invoked his right to counsel after answering some of the detective's questions about the robberies, leading the detective to terminate the interview.[13] Where "the accused waived his rights and made some statements to the police, the fact that he stopped answering questions and asked for an attorney . . . is admissible to explain why the interview terminated." Paul S. Milich, Ga. Rules of Evidence § 27:2 (Oct. 2020 update). As we have explained, "an officer's explanation that the defendant stopped answering questions and wanted an attorney [is] not a comment on defendant's silence; rather, it [is] an explanation of the officer's course of conduct." *Sanders v. State*, 230 Ga. App. 176, 177 (3) (495 SE2d 653) (1998). Accordingly, under the circumstances here, the evidence of Intemann's invocation of his right to counsel was not an improper comment on his right to remain silent. See id. See also *Martin v. State*, 290 Ga. 901, 903 (1) (a) (725 SE2d 313) (2012) (holding that evidence that the defendant "invoked his right to an attorney after giving a

---

[13] As previously noted, Intemann later reinitiated the interview.

22

lengthy statement to police, and that the interview was then properly terminated," did not constitute an impermissible comment on the defendant's invocation of his right to counsel); *Rowe v. State*, 276 Ga. 800, 805 (4) (582 SE2d 119) (2003) (concluding that "admission of the videotape ending with [the defendant's] request for an attorney did not amount to an improper comment on his right to remain silent warranting the reversal of his conviction"); *Williams v. State*, 258 Ga. 281, 284 (2) (368 SE2d 742) (1988) (officer's testimony that defendant discussed crime during police interview and that interview ended when the defendant invoked his right to counsel did not constitute an improper comment on the defendant's right to remain silent). It follows that Intemann cannot show that his trial counsel was deficient in failing to object to the detective's testimony. See *Martin*, 290 Ga. at 903 (1) (a). See also *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019) ("The failure to make a meritless objection cannot serve as a ground for an ineffective assistance claim.").

(b) Intemann argues that his trial counsel was ineffective by failing to object to the trial court instructing the jury on the law relating to conspiracy and party to a crime.[14] Intemann notes that he implicated Contee and Courtney in the robberies, and

_____

[14] The trial court's charge tracked the language of several suggested pattern jury instructions relating to conspiracy and party to a crime. See Georgia Suggested Pattern Instructions, Vol. II: Criminal Cases §§ 1.42.10 (Parties to Crime), 1.42.11

23

he maintains that there was no evidence of an agreement between him and those individuals to commit the robberies. Hence, Intemann contends that there was no evidence to support jury instructions pertaining to conspiracy and party to a crime and that his counsel therefore should have objected. We disagree because there was evidence to support the aforementioned jury instructions.

"To authorize a requested jury instruction, there need only be slight evidence to support the theory of the charge[.]" *Calmer v. State*, 309 Ga. 368, 369-370 (2) (846 SE2d 40) (2020). "Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law." (Citation and punctuation omitted.) *McClure v. State*, 306 Ga. 856, 863 (1) (834 SE2d 96) (2019).

Under Georgia law, "[t]he State may prove a conspiracy by showing that two or more persons tacitly came to a mutual understanding to pursue a criminal objective. And the conspiracy may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances." (Citations and punctuation omitted.) *Edge v. State*, 275 Ga. 311, 313 (6) (567 SE2d 1) (2002). As to the law of party to a crime,

---

(Principal, Failure to Prosecute; Other Involved Persons), 2.02.20 (Conspiracy, Additional Instructions, Culpability), 2.02.30 (Conduct and Presence of Parties).

24

Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime. . . . A person is concerned in the commission of a crime only if he . . . [d]irectly commits the crime; . . . [i]ntentionally aids or abets in the commission of the crime; or . . . [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime.

OCGA § 16-2-20 (a), (b) (1), (3), and (4). See *Coley v. State*, 305 Ga. 658, 662-663 (4) (827 SE2d 241) (2019). A defendant's presence, companionship, and conduct before, during, and after the commission of the crime are factors that a jury may consider in determining whether the defendant was a party to the crime and participated in a conspiracy to commit the offense. See *Shepard v. State*, 300 Ga. 167, 170-171 (3) (794 SE2d 121) (2016); *Coe v. State*, 293 Ga. 233, 235 (1) (748 SE2d 824) (2013).

Applying these principles, we conclude that there was evidence to support the jury instructions on the law of conspiracy and party to a crime. It is true that Intemann claimed that his friends Contee and Courtney alone committed the robberies, but Intemann gave conflicting statements to the police about what transpired and who was involved in the crimes, and "[a] jury may believe a part of the defendant's testimony and disbelieve the rest, and combine that part of the testimony which they

25

believe with a part of the testimony of other witnesses in the case." *Heard v. State*, 149 Ga. App. 92, 93 (2) (253 SE2d 454) (1979).

Here, there was evidence – based on Intemann's own statements, the testimony of the husband and boyfriend that the voices of the seller and robbers were not the same, and the testimony of Intemann's mother that Courtney called her to see if Intemann was giving names to the police – that other people besides Intemann participated in the robberies. And Intemann admitted that he placed the Craigslist advertisements for the iPhone and MacBook, that he was with the robbers immediately before and after the offenses were committed, that he told the boyfriend in the November 22 robbery to meet him at the Walgreens, that his handgun was used in the October 29 robbery, and that his MacBook box and bag were used in the November 22 robbery. These admissions by Intemann, combined with other direct and circumstantial evidence presented at trial, would support a finding that Intemann participated with others in the robberies by setting up the Craigslist advertisements for the ostensible sale of the iPhone and MacBook, communicating with the victims about the purported sales, luring the victims to the robbery locations, and supplying the handgun and other materials for use in the robberies. Because there was evidence that Intemann conspired with others to rob the victims and aided and abetted the

commission of the robberies,[15] the jury instructions on the law of conspiracy and party to a crime were proper. Accordingly, Intemann's trial counsel was not deficient in failing to object to those charges. See *Leeks v. State*, 303 Ga. 104, 109 (3), n. 6 (810 SE2d 536) (2018) (concluding that "any claim that trial counsel was ineffective for failing to object to the party to a crime charge is foreclosed by our determination that the trial court did not err in giving this instruction").

(c) Intemann asserts that his trial counsel was ineffective by failing to object to the lead detective's testimony about research into the phone number linking the Craigslist iPhone advertisement to Intemann. Specifically, at trial, the detective testified that he had a crime analyst run the phone number associated with the Craigslist iPhone advertisement through a computer database, and that the analyst's report led the detective to connect the phone number to Intemann's home address. According to Intemann, the detective's testimony contained inadmissible hearsay.

---

[15] See *Menzies v. State*, 304 Ga. 156, 161 (II) (816 SE2d 638) (2018) (concluding that evidence that defendant, among other things, lured victims to scene of robbery supported finding that defendant engaged in conspiracy and was party to the crime); *Platt v. State*, 335 Ga. App. 49, 54 (1) (a) (778 SE2d 416) (2015) (noting that defendant who provides a weapon, ammunition, or other supplies to another party for use in a crime can be found guilty as a party to that crime).

At the hearing on the motion for new trial, Intemann's counsel testified that although the detective's testimony about the crime analyst's report involved hearsay, he chose not to object because Intemann admitted during his police interviews that he placed the Craigslist advertisements, and counsel knew from pretrial rulings that Intemann's interviews would later be introduced at trial. Counsel testified that, as a result, he did not believe that the issue of whether Intemann placed the Craigslist advertisements would "be a controversy for the jury," and he did not want to risk putting more emphasis on the matter in the jury's mind by raising a hearsay objection.

Given the strategic nature of counsel's decision not to object to the detective's testimony, the decision "can provide no grounds for reversal unless it was so patently unreasonable that no competent attorney would have chosen it." (Citation and punctuation omitted.) *Brown v. State*, 321 Ga. App. 765, 768 (2) (743 SE2d 452) (2013). And because the detective's testimony was cumulative of Intemann's own admissions, counsel's decision not to object was not patently unreasonable. See *Snipes v. State*, 309 Ga. 785, 794 (3) (b) (iv) (848 SE2d 417) (2020) (holding that defense counsel was not deficient for failing to object to testimony "largely cumulative of other admissible testimony"); *Sawyer v. State*, 308 Ga. 375, 384 (2) (b) (839 SE2d 582) (2020) ("[T]rial counsel was not deficient in failing to object to the

28

cumulative testimony of the witness on this matter.") (citation and punctuation omitted). Moreover, it is a reasonable strategic decision to forego an objection so as not to draw the jury's attention to a particular issue, as trial counsel did in this case. See *Gaston v. State*, 307 Ga. 634, 642 (2) (c) (837 SE2d 808) (2020) (concluding that trial counsel's decision not to object was reasonable strategic decision where counsel was concerned that an "objection would have drawn the jury's attention to the testimony"). Consequently, Intemann has failed to demonstrate that his trial counsel was ineffective on the asserted ground.[16]

*Judgment affirmed. Gobeil and Pipkin, JJ., concur.*

---

[16] To the extent that Intemann argues that the cumulative effect of his trial counsel's alleged deficiencies prejudiced the outcome of his trial, "we evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors," and Intemann has failed to show any deficiencies by his trial counsel. (Citation and punctuation omitted.) *Thornton v. State*, 307 Ga. 121, 129 (3) (d) (834 SE2d 814) (2019).